## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ALABAMA AIRCRAFT INDUSTRIES, INC., | ) | Case No. 11-10452 (PJW) |
| et al.,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | RE: Docket No. *456, 485* |
| | ) | |

**ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363, AND 365 OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, AND LOCAL RULES 2002-1 AND 6004-1, REQUESTING ENTRY OF AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' OPERATING ASSETS, INCLUDING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS, FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS TO KAISER AIRCRAFT INDUSTRIES, INC. AND AUTHORIZING THE DEBTORS TO ESTABLISH A LITIGATION TRUST AND VEST CERTAIN CLAIMS THEREIN**

Upon consideration of the motion dated August 19, 2011 (the "**Sale Motion**") of the

above captioned debtors and debtors-in-possession (the "**Debtors**"), pursuant to Sections 105(a),

363, and 365 of Title 11, United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules

2002-1 and 6004-1 of the Local Bankruptcy Rules for the District of Delaware (the "**Local

Rules**") requesting entry of an order (the "**Sale Approval Order**"): (i) authorizing and

approving the sale (the "**Sale**") of certain assets (the "**Purchased Assets**") to Kaiser Aircraft

Industries, Inc. (the "**Purchaser**") pursuant to the terms of the asset purchase agreement (the

"**APA**") between the Debtors and the Purchaser, attached hereto as <u>Exhibit A</u>; (ii) authorizing

and approving the Sale by the Debtors of the Purchased Assets, free and clear of all liens, claims

---

[1] The last four digits of the taxpayer identification numbers for each of the Debtors follow in parenthesis: (i) Alabama Aircraft Industries, Inc. (5295); (ii) Alabama Aircraft Industries, Inc.-Birmingham (6533); and (iii) Pemco Aircraft Engineering Services, Inc. (9969).   The mailing address for all of the Debtors is 1943 50th Street North, Birmingham, AL 35212.

encumbrances and interests (other than certain enumerated liabilities that are to be assumed by the Purchaser, as set forth in the APA (the "**Assumed Liabilities**")); (iii) authorizing the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases (collectively, the "**Assumed Executory Contracts and Unexpired Leases**") as identified in the APA; (iv) authorizing the Debtors to establish a litigation trust (the "**Litigation Trust**") pursuant to the terms of the litigation trust agreement attached hereto as Exhibit B (the "**Litigation Trust Agreement**") and (v) granting other related relief; and the Court having conducted a hearing on the Sale Motion on September 1, 2011 (the "**Sale Hearing**"), at which time all interested parties were offered an opportunity to appear and be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto and (ii) the APA and other ancillary documents filed in connection with the Sale, and the Court having considered all objections to the Sale, the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and due and proper notice of the Sale Motion having been provided to: (i) the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), (ii) counsel to the Official Committee of Unsecured Creditors (the "**Committee**"), (iii) the Pension Benefit Guaranty Corporation (the "**PBGC**"), (iv) counsel to the Special Value Bond Fund (the "**SVBF**"); and (v) all parties requesting notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1(b); and due and proper notice of the Sale and the assumption and assignment of the Assumed Executory Contracts and Unexpired Leases otherwise having been provided to any other parties required to be noticed; and it appearing that no other or further notice need be provided; all parties in interest having been heard, or having had the opportunity to be heard regarding the Sale and all transactions contemplated thereunder; and the Court having reviewed and considered the Sale Motion and any objections thereto, and the arguments

of counsel and evidence adduced related thereto; and upon the record of the hearings for consideration of the Sale and the full record of these cases; and the Court having determined that the relief sought in the Sale Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest, and the legal and factual bases set forth in the Sale Motion, and the record establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FURTHER FOUND AND DETERMINED, AS FOLLOWS:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      The Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1134, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      This Sale Approval Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth below in Paragraph 27.

D.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Sale Motion or the APA.

3

F.     Notice of the Sale Motion and of the Sale Hearing was due and sufficient and given in accordance with applicable law, as evidenced by the affidavits of service set forth at Docket Nos. 458 and 459.

G.     The Notice of Assumption and Assignment, which sets forth the Debtors' proposed Cure Costs and was served upon all non-debtor counterparties to Assumed Executory Contracts and Unexpired Leases as evidenced by the affidavits of service set forth at Docket Nos. 459 and 467, provides due, adequate, and timely notice of the proposed assumption and assignment of Assumed Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors and assigned to the Purchaser, in accordance with Bankruptcy Rule 2002 and the applicable provisions of the Bankruptcy Code and any otherwise applicable requirement for notice is hereby waived and dispensed with. The forgoing notice was fair and reasonable and no further notice is required. At Closing, in the accordance with the terms of the APA, Purchaser shall pay the Cure Costs as set forth in Exhibit C hereto.

H.     Adequate assurance exists that the Purchaser will fully perform all future obligations under the Assumed Executory Contracts and Unexpired Leases, including, without limitation, the adequate protection provided to the Birmingham Airport Authority ("**BAA**") on account of the lease between BAA and the Debtors (the "**Facility Lease**") as set forth in Paragraph 18 of this Order. Assumption and assignment of the Assumed Executory Contracts and Unexpired Leases is an appropriate exercise of the Debtors' business judgment. The Debtors believe that the Assumed Executory Contracts and Unexpired Leases identified in the APA are each valid and enforceable. Any objection by a non-debtor counterparty to the assumption and assignment of the Assumed Executory Contracts and Unexpired Leases on the grounds that the Purchaser has not provided adequate assurance of future performance is

4

overruled in its entirety.  Notwithstanding any other provision of this Order, the APA or any document implementing the sale (collectively, the "**Documents**"), no Executory Contract, unexpired Lease, license, authorization, guaranty, memorandum of understanding, agreement or other interest in which the United States, its agencies, departments or agents (the "**United States**") is a party thereto (the "**Government Contracts**") may be assumed and/or assigned without: (1) the express written consent of the United States; (2) the execution of a novation agreement applicable to that Government Contract; and (3) the payment of all outstanding post-Petition Date obligations and cure amounts arising under or related to such Government Contract.  Nothing in the Documents shall be interpreted to set cure amounts or to require the United States to novate or otherwise consent to the transfer of any Government Contracts.  The Unites States' rights to offset or recoup any amounts due under, or relating to, any Government Contracts are expressly preserved.

I.      The Debtors submitted evidence establishing that the Cure Costs they propose to pay in connection with the assumption and assignment of the Assumed Executory Contracts and Unexpired Leases is adequate, appropriate, and sufficient to cure any and all defaults arising under the Assumed Executory Contracts and Unexpired Leases.  Non-debtor parties to Assumed Executory Contracts and Unexpired Leases have (a) not objected to the Cure Costs that are proposed to be paid pursuant to the terms of the APA, (b) consensually resolved the amount of the Cure Cost applicable thereto, or (c) asserted objections that are otherwise overruled in their entirety.

J.      The highest and best offer for the Purchased Assets was submitted by the Purchaser pursuant to the terms of the APA.

K.      The establishment of the Litigation Trust pursuant to the terms of the APA and the Litigation Trust Agreement is a fair and appropriate use of the Debtors' property.

L.      The APA and all ancillary documents thereto, including, without limitation, the Litigation Trust Agreement, were negotiated and proposed, and have been entered into by the parties in good faith within the meaning of Section 363(m) of the Bankruptcy Code, at arm's length bargaining positions, and without collusion; the Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and entitled to the protections thereof and is not an insider of the Debtors, as that term is defined in Section 101 of the Bankruptcy Code; the legal and factual bases set forth in the Sale Motion establish just cause for the relief granted herein; and the relief granted herein is in the best interests of Debtors and their estates.

M.      The Purchased Assets are property of the Debtors and title thereto is vested in the Debtors. The Purchased Assets do not include any government-furnished property as defined in 48 C.F.R. Part 52.245-1. Nothing in the Documents shall be interpreted to authorize any transfer or sale of government-furnished property without the express written consent of the United States. The Purchased Assets also do not include any property owned or furnished by The Boeing Company ("**Boeing**") or in which Boeing has title and nothing in the Documents shall be interpreted to authorize any transfer or sale of property owned by Boeing without the express written consent of Boeing.

N.      The transfer of the Purchased Assets, in each case, satisfies one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code. Those holders of Liens and Claims in any Purchased Assets which did not object, or which withdrew their objections, to the

Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

O.   Except as otherwise expressly provided in the APA or this Order, no further consents or approvals are required for the Debtors to consummate the Sale of the Purchased Assets and the other transactions and acts contemplated by the APA and all ancillary documents, including, without limitation the Litigation Trust Agreement, other than the consent and approval of this Court, and the consummation of the transactions contemplated by the Sale Motion will not result in the forfeiture of any of the Purchased Assets. Neither the execution of the APA nor the consummation of the Sale of the Purchased Assets in accordance with the terms of the APA will constitute a violation of any provision of the organizational documents of the Debtors or any other instrument, law, regulation, or ordinance by which any of the Debtors is bound.

P.   The consideration to be paid by the Purchaser to the Debtors for the Purchased Assets pursuant to the APA (i) is fair and reasonable; (ii) is the highest and/or otherwise best offer for the Purchased Assets; (iii) is not subject to avoidance pursuant to Section 363(n); and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act and any and all similar laws of any state or jurisdiction whose law is applicable to the Sale and transaction contemplated thereby.

Q.   All objections thereto having been resolved, other than as set forth below.

R.   At the Sale Hearing, the Debtors and the Purchaser requested that certain language set forth below in Paragraphs 13, 14 and 15 of this Sale Order be included to modify certain terms of the APA (the "**APA Modifications**"). The Court finds that the requested APA

7

Modifications do not materially alter the terms of the APA, are fair, reasonable, and appropriate, and properly clarify and effectuate the contractual intent of the Debtors and the Purchaser in the APA.

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Sale Motion is granted to the extent provided herein. All objections to the Sale Motion, including the proposed assumption and assignment of Assumed Executory Contracts and Unexpired Leases and the payment of Cure Costs in connection therewith, that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits and denied.

2.    The Debtors are hereby authorized and empowered to enter into the APA and perform all acts contemplated by the APA, including without limitation establishment of the Litigation Trust and vesting of the Trust Causes of Action in the Litigation Trust, and the APA is hereby approved in its entirety and incorporated herein by reference, and it is further ordered that all amounts payable under the APA shall be payable without the need for any application therefor or a further order of the Court.

3.    Pursuant to Section 363(f) of the Bankruptcy Code, all of the Purchased Assets shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code), whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this Chapter 11 case was commenced (collectively, the "**Liens**"), with such Liens to attach to the proceeds and consideration (whether in the form of

cash or otherwise) payable to or at any time received by the Debtors under the APA with the same validity, force, priority and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist. The Purchased Assets do not include any government-furnished property as defined in 48 C.F.R. Part 52.245-1. Furthermore, the Purchased Assets do not include any property owned or furnished by Boeing or in which Boeing has title. Nothing in the Documents shall be interpreted to authorize any transfer or sale of government-furnished property without the express written consent of the United States. Nothing in the Documents shall be interpreted to authorize the transfer or sale of property owned or furnish by Boeing or in which Boeing has title without the express written consent of Boeing.

4.     Subject to Paragraph 5 of this Order, the vesting of the Trust Causes of Action in the Litigation Trust shall be free and clear of all Liens, with such Liens to attach to the beneficial interests granted the Debtors' estates (but not the beneficial interests granted to the Purchaser) with the same validity, force, priority and effect as the same had with respect to the Trust Causes of Action, and subject to any and all defenses, claims and/or counterclaims or setoffs that the Debtors or their estates may have with respect to such Liens. Further, the vesting of the Trust Causes of Action in the Litigation Trust shall not violate any restriction under applicable law regarding the assignability or transferability of the Trust Causes of Action, or result in any impairment or limitation of any kind in the full prosecution and recovery of the Trust Causes of Action that may otherwise result under applicable non-bankruptcy law from the assignment or transfer of the Trust Causes of Action. Except as otherwise provided in this paragraph 4, the vesting of the Trust Causes of Action in the Litigation Trust shall be subject to all applicable defenses to such Trust Causes of Action.

5.      Notwithstanding anything to the contrary in this Order, the APA, or the Litigation Trust Agreement: (i) any setoff rights of the Boeing Company and its affiliates (collectively, "**Boeing Parties**" and each a "**Boeing Party**") against a Trust Cause of Action (the "**Offset Rights**") are preserved and shall survive the vesting of such Trust Cause of Action in the Litigation Trust, provided that any such Offset Rights shall remain subject to Bankruptcy Code section 553 to the extent applicable, and to any applicable defenses to such Offset Rights; (ii) the vesting in the Litigation Trust of Trust Causes of Action against the Boeing Parties (and against any current or former officers, directors, employees, agents or attorneys of the Boeing Parties, in such capacity) shall be subject to any applicable defenses thereto (including, without limitation, recoupment); (iii) any Boeing Party against which a Trust Cause of Action is filed is hereby granted relief from the automatic stay under Bankruptcy Code section 362 for the limited purpose of asserting and adjudicating its Offset Rights against such Trust Cause of Action in the action in which the Trust Cause of Action is filed; (iv) as between the holders of beneficial interests in the Litigation Trust, the impact of any such Offset Rights shall be allocated as provided in Section 5.2(e) of the Litigation Trust Agreement; and (v) subsection (iv) of this paragraph shall not have any effect on the Boeing Parties.

6.      The Debtors are authorized at Closing to assume the Assumed Executory Contracts and Unexpired Leases and assign the same to the Purchaser.  Upon assumption and assignment, the Purchaser is directed to pay the Cure Costs in accordance with the terms of the APA in the amounts set forth in Exhibit C to this Order.

7.      The Debtors and the Purchaser, and each of their respective officers, employees and agents, are hereby authorized to take such actions necessary and appropriate to implement the APA and to close the transactions contemplated thereby without the necessity of a further

order of this Court as provided by the APA, including, but not limited to, the assumption and assignment of the Assumed Executory Contracts and Unexpired Leases and the establishment of the Litigation Trust, all in accordance with the terms of the APA.

8.      All of the transactions contemplated by the APA, the closing of the Sale, assignment of the Assumed Executory Contracts and Unexpired Leases, the establishment of the Litigation Trust, and the vesting of the Trust Causes of Action in the Litigation Trust shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.

9.      The Purchaser shall not be liable for any claims or liabilities against the Debtors including, without limitation, any of the Excluded Liabilities, other than as expressly assumed by the Purchaser in the APA.  Without limiting the generality of the other provisions of this Order, the Purchaser, under no circumstances, shall be deemed to be a successor of the Debtors. Accordingly, the Purchaser shall have no successor or vicarious or other liabilities of any kind with respect to the Debtors or the Purchased Assets, and all persons and entities shall be hereby enjoined from asserting any such claims against the Purchaser.

10.      The provisions of this Order and the APA and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization or liquidation of the Debtors, or which may be entered converting the Debtors' cases from Chapter 11 to Chapter 7, and the terms and provisions of the APA as well as the rights and interests granted pursuant to this Order and the APA shall continue in this or any superseding case and shall be binding upon the Debtors, the Purchaser and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under Chapter 7 or 11 of the Bankruptcy Code.  Any trustee

appointed in these cases shall be and hereby is authorized and directed to comply with the terms of this Order and the APA and the Purchaser and the trustee shall be and hereby are authorized to perform under the APA upon the appointment of a trustee without the need for further order of this Court.

11.     To the extent, if any, anything contained in this Order conflicts with a provision in the APA or the Litigation Trust Agreement, this Order shall govern and control.

12.     The APA or any document relating thereto may be modified, amended, or supplemented by the parties thereto, in a writing signed by such parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors or their estates.

13.     The definition of "Intellectual Property" in the APA is hereby modified and replaced in its entirety with the following: "'Intellectual Property' means all intellectual property and intellectual property rights of Sellers, including, without limitation, the following:  (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, (iv) all Software, (v) internet addresses, uniform resource locators, web sites and web pages, (vi) confidential information, know-how, trade secrets and inventions and (vii) all other intellectual property."

14.     The definition of "Trust Causes of Action" in the APA is hereby modified and replaced in its entirety with the following: "'Trust Causes of Action' means all Causes of Action of the Debtors or their estates, but specifically excluding any Causes of Action of the Debtors relating to (i) warranty claims or breach of contract claims with respect to Inventory, Furniture and Equipment that constitute Purchased Assets, (ii) the collection of any Accounts Receivable or other similar rights of collection, including the Debtors' rights to collect Work in Process as set forth in the Purchase Agreement, (iii) Avoidance Actions, (iv) the GECAS Judgment, (v) Causes of Action specifically identified and allocated between Purchaser and the Debtors pursuant to the Purchase Agreement, (vi) claims of the Debtors against any current or former officer or director of the Debtors, and (vii) this Agreement."

15.     Section 2.1(b)(vi) of the APA is hereby modified and replaced in its entirety with the following: "all Documents in Sellers' possession and/or control, or in which Sellers hold or have any ownership or other interest (and all rights to obtain possession of or access to all such Documents), including further, without limitation, Documents generated and/or maintained by in-house and outside counsel, accountants and other professionals of Sellers within fifteen (15) years prior to the Closing Date, but excluding any Documents exclusively related to an Excluded Asset."

16.     There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Debtors or to the Purchaser or its affiliates or designees as a result of the assumption and assignment by the Debtors to the Purchaser of the Assumed Executory Contracts and Unexpired Leases, and the validity of such assumption or assignment shall not be affected by any dispute between the Debtors and any counterparty to any Assumed Executory Contract or Unexpired Lease, and the Assumed Executory Contracts and Unexpired Leases, upon

assignment to Purchaser, shall be deemed valid and binding and in full force and effect in accordance with their terms.

17.    The Debtors' decision to assume and assign to the Purchaser the Assumed Executory Contracts and Unexpired Leases is subject to the closing of the Sale (the "**Closing**"). Accordingly, absent such Closing, none of the Assumed Executory Contracts and Unexpired Leases shall be deemed assumed or assigned and shall in all respects remain subject to further administration under the Bankruptcy Code.  The inclusion of any document on the list of Assumed Executory Contracts and Unexpired Leases shall not constitute or be deemed a determination or admission by the Debtors or the Purchaser that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code.

18.    The Debtors and the Purchaser have cured, or will cure prior to the Closing, defaults relating to the Assumed Executory Contracts and Unexpired Leases by providing the cure set forth on Exhibit C of this Order, and have provided each non-debtor party to an Assumed Executory Contract or Unexpired Lease adequate assurance of future performance within the meaning of §§ 365(b)(1) and 365(f)(2)(B) of the Bankruptcy Code.  With respect to BAA only, as additional agreed adequate protection, the parent of the Purchaser, Kaiser Group Holdings, Inc. ("**KGHI**"), shall issue a limited guarantee in favor of BAA guaranteeing the payment obligations of the Purchaser under the Facility Lease in an amount up to $100,000 all in accordance with and pursuant to the terms of a guarantee agreement (the "**KGHI Guarantee**") to be provided at Closing by KGHI to BAA, which KBHI Guarantee shall be reasonably acceptable to KGHI and BAA, and consistent with the terms stated on the records by their counsel at the hearing on the Sale Motion.

19.    The assumption and assignment of the Assumed Executory Contracts and Unexpired Leases, free and clear of all Liens and Claims of any kind or nature whatsoever, to the Purchaser is approved in all respects, subject to the clarifications contained in Paragraphs 20 through 25 below.

20.    Upon entry of this Order, and pursuant to §§ 105(a), 363 and 365 of the Bankruptcy Code, the Assumed Executory Contracts and Unexpired Leases are deemed assumed at Closing according to their terms.  Notwithstanding any other provision in these Documents, no Government Contracts may be assumed and/or assigned without: (1) the express written consent of the United States; (2) the execution of a novation agreement applicable to that Government Contract; and (3) the payment of all outstanding post-Petition Date obligations and cure amounts arising under or related to such Government Contract.  Nothing in the Documents shall be interpreted to set cure amounts or to require the United States to novate or otherwise consent to the transfer of any Government Contracts.  The United States' rights to offset or recoup any amounts due under, or relating to, any Government Contracts are expressly preserved.

21.    Nothing in this Order or the APA releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that an entity would be subject to as the owner or operator of property after the date of entry of this Order.  Nothing in this Order or the APA authorizes the transfer or assignment to Purchaser of any license, permit, registration, authorization, or a royal of or with respect to, a governmental unit without Purchaser's complying with all applicable legal requirements under nonbankruptcy law governing such transfers or assignments.

22.    Oracle America, Inc.'s ("**Oracle**") consent to the assumption and assignment of its Services Contract number 4433690 and the Oracle License and Services Agreement dated

February 27, 2006 between Oracle USA, Inc. and Pemco Aviation Group, Inc., together with any amendments thereto (the "**Oracle Agreements**"), is subject to: (i) Purchaser and Debtors' entry into, and execution of, an assignment agreement with Oracle, as negotiated and agreed to by Oracle, the Debtors and the Purchaser; and (ii) Oracle's receipt of a payment in the amount of $55,254.77, less any amounts paid by Debtors, including the $7,874.13 payment paid by Debtors to Oracle on August 31, 2011, contingent on that sum having been received by Oracle or its assignee, Banc of America Leasing, in good funds prior to Closing.  For avoidance of doubt, should Oracle demonstrate that the payments allegedly made by the Debtors to Oracle's assignee, Banc of America Leasing, in the amount of $16,020, for the invoice issued by Oracle in April 2011, and which payment cleared the Debtors' bank account on May 9, 2011, has not been received in good funds by Oracle or Banc of America Leasing, or their assignees, and that a payment in the amount of $16,020 for May 2011 was due and remains unpaid to Oracle and Banc of America Leasing, Oracle and the Debtors reserve all of their rights with respect to the same.

23.     Notwithstanding Section 2.4(v) of the Asset Purchase Agreement or anything else to the contrary, upon Closing, Purchaser shall be responsible for (a) all Liabilities and obligations under the Assumed Executory Contracts between the Debtors and Lockheed Integrated Systems, Inc. and its affiliates (collectively, "**Lockheed**") arising after the Closing; and (b) any and all warranty obligations imposed by Section 4.4.4 of the Performance-Based Work Statement, attached as Attachment 8 to P.O. number 7200005350 dated 6/29/2009, as amended by change orders, with all attachments, in support of contract FA8530-08-D-0008, Delivery Order 0004, entitled "Romanian Avionics Upgrade Modification" by and between Lockheed Martin

16

Integrated Systems, Inc. and the Debtors, except for any obligations arising from any breach of such warranties known to Lockheed as of the Closing.

24.    This Order shall be binding on all creditors (whether known or unknown) of the Debtors and all affected third parties, all successors and assigns of the Purchaser, Debtors, their affiliates and any subsequent trustee(s) appointed in Debtors' Chapter 11 cases or upon a conversion to Chapter 7 under the Bankruptcy Code and shall not be subject to rejection or revocation.

25.    Consistent with, but not in limitation of the foregoing, each and every federal, state, and local government agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale; provided, however, that nothing in this Paragraph 25 shall derogate the requirements for assumption and assignment of Government Contracts set forth in Paragraph 20 of this Order.

26.    Except as otherwise set forth in this Order, this Court shall retain exclusive jurisdiction with regard to all issues or disputes in connection with this Order and the relief provided for herein, and to resolve any disputes related to the APA or the implementation thereof.

27.    As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Approval Order will not be stayed for 14 days after the entry of the Sale Approval Order and will be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Approval Order.

Dated: September 6, 2011
        Wilmington, Delaware

_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

17

**EXHIBIT A**

**ASSET PURCHASE AGREEMENT**

*EXECUTION VERSION*

ASSET PURCHASE AGREEMENT

by and among

KAISER AIRCRAFT INDUSTRIES, INC., as Purchaser

and

ALABAMA AIRCRAFT INDUSTRIES, INC.,

ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM

and

PEMCO AIRCRAFT ENGINEERING SERVICES, INC., as Sellers

Date: August 19, 2011

## TABLE OF CONTENTS

Page(s)

ARTICLE I   DEFINITIONS ...................................................................................2
  1.1.   Certain Definitions ................................................................................. 2
  1.2.   Other Definitional and Interpretive Matters ......................................... 11
ARTICLE II   PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..12
  2.1.   Purchase and Sale of Assets .................................................................. 12
  2.2.   Excluded Assets .................................................................................... 14
  2.3.   Assumption of Liabilities ...................................................................... 15
  2.4.   Excluded Liabilities .............................................................................. 15
  2.5.   Executory Contracts and Unexpired Leases .......................................... 15
  2.6.   Further Conveyances, Assumptions and Cooperation ............................ 16
ARTICLE III   CONSIDERATION ..........................................................................16
  3.1.   Consideration ........................................................................................ 16
  3.2.   Payment of the Purchase Price .............................................................. 16
  3.3.   Distribution of the Litigation Trust Participation Amount ..................... 17
ARTICLE IV   CLOSING AND TERMINATION .......................................................17
  4.1.   Closing Date .......................................................................................... 17
  4.2.   Deliveries by Sellers ............................................................................. 17
  4.3.   Deliveries by Purchaser ......................................................................... 17
  4.4.   Termination of Agreement ..................................................................... 18
  4.5.   Procedure Upon Termination ................................................................. 19
  4.6.   Effect of Termination ............................................................................ 19
ARTICLE V   REPRESENTATIONS AND WARRANTIES OF SELLERS .......................20
  5.1.   Organization and Good Standing ........................................................... 20
  5.2.   Authorization of Agreement .................................................................. 20
  5.3.   Conflicts; Consents of Third Parties ...................................................... 20
  5.4.   Title to Purchased Assets ...................................................................... 21
  5.5.   Intellectual Property .............................................................................. 21
  5.6.   Litigation ............................................................................................... 21
  5.7.   Compliance with Laws .......................................................................... 21
  5.8.   Permits .................................................................................................. 21
  5.9.   Inventory ............................................................................................... 22
  5.10.   Contracts .............................................................................................. 22
  5.11.   Taxes .................................................................................................... 22
  5.12.   Labor Matters ....................................................................................... 23
  5.13.   Environmental Matters .......................................................................... 23
  5.14.   Brokers ................................................................................................. 24
ARTICLE VI   REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................24
  6.1.   Organization and Good Standing ........................................................... 24
  6.2.   Authorization of Agreement .................................................................. 24
  6.3.   Conflicts; Consents of Third Parties ...................................................... 25
  6.4.   Financing ............................................................................................... 25
  6.5.   Brokers .................................................................................................. 25
ARTICLE VII   BANKRUPTCY COURT MATTERS ..................................................25
  7.1.   Bankruptcy Court Approval ................................................................... 25

i

7.2.    Bankruptcy Court Filings ........................................................................ 25
ARTICLE VIII   COVENANTS ..............................................................................26
8.1.    Access to Information .............................................................................. 26
8.2.    Conduct Pending the Closing................................................................. 26
8.3.    Confidentiality ........................................................................................ 28
8.4.    Section 363(b)(1)(A)................................................................................ 28
8.5.    Adequate Assurances Regarding Assumed Executory Contracts and Assumed Leases
        29
8.6.    Material Adverse Effect .......................................................................... 29
8.7.    Name Change ........................................................................................... 29
8.8.    Prorations ................................................................................................ 29
8.9.    Consents ................................................................................................... 29
8.10.   Further Assurances.................................................................................. 29
8.11.   Preservation of Records .......................................................................... 29
8.12.   Publicity ................................................................................................... 30
8.13.   Payment of Taxes .................................................................................... 30
8.14.   Motions, Orders, etc................................................................................ 30
8.15.   Environmental Matters............................................................................ 30
8.16.   Post-Closing Conduct of Business ......................................................... 30
ARTICLE IX     EMPLOYEE MATTERS ...............................................................31
9.1.    No Obligation to Employ ........................................................................ 31
9.2.    Prospective Employees ............................................................................ 31
9.3.    Sellers' Retention of Employees.............................................................. 31
ARTICLE X     CONDITIONS TO CLOSING..........................................................31
10.1.   Conditions Precedent to Obligations of Purchaser ............................... 31
10.2.   Conditions Precedent to Obligations of Sellers ..................................... 33
10.3.   Conditions Precedent to Obligations of Purchaser and Seller .............. 33
10.4.   Frustration of Closing Conditions .......................................................... 33
ARTICLE XI     TAXES ...........................................................................................34
11.1.   Purchase Price Allocation ...................................................................... 34
11.2.   Tax Reporting .......................................................................................... 34
11.3.   Cooperation and Audits .......................................................................... 34
11.4.   Transfer Taxes......................................................................................... 34
ARTICLE XII   MISCELLANEOUS ......................................................................34
12.1.   Expenses................................................................................................... 34
12.2.   Submission to Jurisdiction; Consent to Service of Process ................... 35
12.3.   Waiver of Right to Trial by Jury ............................................................. 35
12.4.   Entire Agreement; Amendments and Waivers......................................... 35
12.5.   Governing Law ........................................................................................ 35
12.6.   Notices ..................................................................................................... 36
12.7.   Severability ............................................................................................. 38
12.8.   Assignment............................................................................................... 38
12.9.   Counterparts ........................................................................................... 38

*EXECUTION VERSION*

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into and dated as of August __, 2011, by and among KAISER AIRCRAFT INDUSTRIES, INC., a Delaware limited liability company ("Purchaser"), and ALABAMA AIRCRAFT INDUSTRIES, INC., a Delaware corporation ("AAII"), ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM, an Alabama corporation ("AAII-Birmingham"), and PEMCO AIRCRAFT ENGINEERING SERVICES, INC., a Delaware corporation ("Pemco" and together with AAII and AAII-Birmingham, "Sellers").

## WITNESSETH

WHEREAS, Sellers are engaged in the business of providing aircraft maintenance and modification services, including complete airframe inspection, maintenance and repair, custom airframe design and modification, and programmed depot maintenance, on large transport, tanker and patrol aircraft (the "Business");

WHEREAS, on February 15, 2011, each of the Sellers commenced a voluntary case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), jointly administered under Case No. 11-10452 (the "Bankruptcy Case");

WHEREAS, upon the terms and subject to the conditions set forth herein and as authorized under Sections 105, 363 and 365 of the Bankruptcy Code, Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the Purchased Assets (as defined below) in exchange for the payment by Purchaser of the Purchase Price (as defined below) and the assumption by Purchaser of the Assumed Liabilities (as defined below);

WHEREAS, Sellers believe, following consultation with their financial advisor and consideration of available alternatives, that, in light of the current circumstances, a sale of the Purchased Assets on the terms set forth in this Agreement will maximize the value of the Purchased Assets and is in the best interest of Sellers, their estates, creditors and other parties-in-interest;

WHEREAS, Sellers and Purchaser wish to enter into this Agreement pursuant to which Sellers shall sell and transfer to Purchaser, and Purchaser shall purchase and acquire from Sellers, the Purchased Assets in accordance with the terms hereof;

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") shall be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code; and

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereto hereby agree as follows:

# ARTICLE I
## DEFINITIONS

1.1.    <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"AAII" has the meaning ascribed to such term in the Preamble.

"AAII-Birmingham" has the meaning ascribed to such term in the Preamble.

"Accounts Receivable" means all accounts receivable, notes receivable and other monies due for sales and deliveries of goods or performance of services by Sellers fully completed and performed prior to Closing arising out of the conduct of the Business, whether recorded within the Sellers' financial statements, and the full benefit of all security for such accounts or rights to payment, including all trade, vendor and other accounts receivable representing amounts receivable in respect of goods sold or services rendered to customers of the Business or in respect of amounts refundable or otherwise due to the Sellers from vendors, suppliers or other Persons in connection with the Business.

"Agreement" has the meaning ascribed to such term in the Preamble.

"Allocation Statement" has the meaning ascribed to such term in <u>Section 11.1</u>.

"Assignment and Assumption Agreement" has the meaning ascribed to such term in <u>Section 4.2(b)</u>.

"Assumed Executory Contracts" means the Executory Contracts set forth in <u>Schedule 1-A</u> hereto which Purchaser hereby directs that the Sellers assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code as set forth in <u>Section 2.5</u>. <u>Schedule 1-A</u> may be revised and updated from time to time by Purchaser in accordance with <u>Section 2.5</u>.

"Assumed Leases" means the Leases set forth in <u>Schedule 1-B</u> hereto which Purchaser hereby directs that the Sellers assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code to Purchaser as set forth in <u>Section 2.5</u>.  <u>Schedule 1-B</u> may be revised and updated from time to time by Purchaser in accordance with <u>Section 2.5</u>.

"Assumed Liabilities" has the meaning ascribed to such term in <u>Section 2.3</u>.

"Avoidance Actions" means causes of action of the Debtors' bankruptcy estates arising under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" has the meaning ascribed to such term in the Recitals.

"Bankruptcy Code" has the meaning ascribed to such term in the Recitals.

"Bankruptcy Court" has the meaning ascribed to such term in the Recitals.

2

"Bill of Sale" has the meaning ascribed to such term in Section 4.2(a).

"Business" has the meaning ascribed to such term in the Recitals.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized by law to close.

"Cash Collateral Order" means the "Order on Third Motion of the Debtors Seeking an Order Approving Continued Use of Cash Collateral" entered by the Bankruptcy Court on August 8, 2011 appearing at Docket No. 441 in the Bankruptcy Case and any extension of such Order on materially the same terms.

"Causes of Action" means, without limitation, any and all of Sellers' actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, rights of adjustment, Claims, and demands whatsoever, including Avoidance Actions, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Closing Date.

"CBA" means that certain collective bargaining agreement between Alabama Aircraft Industries, Inc.-Birmingham and the Union dated March 21, 2005, as amended on March 21, 2010.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning ascribed to such term in Section 4.1.

"Closing Date" has the meaning ascribed to such term in Section 4.1.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Bankruptcy Case.

"Contract" means any contract, indenture, note, bond, instrument, lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement, in each case that is related to the Business.

"Cure Costs" means the amount determined by the Bankruptcy Court to be necessary to cure all monetary defaults under the Assumed Executory Contracts and Assumed Leases pursuant to section 365 of the Bankruptcy Code.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web

pages, etc.), and other similar materials related to the Purchased Assets or used or held for use in connection with the Business in each case whether or not in electronic form.

"Employee Benefit Plan" means each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option or other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, dental, vision, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, change in control, retention or severance plan, agreement or arrangement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by any Seller or an ERISA Affiliate, that together with such Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which any Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any employee or former employee of any Seller or any former subsidiary of any Seller.

"Encumbrances" means any Lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, escrow, encumbrance, option, right of first refusal, transfer restriction, conditional sale contract, title retention contract, lease, hypothecation, indenture, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral.

"Environmental Action" means any complaint, summons, citation, notice, directive, Order, Claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Body involving violations of Environmental Laws or Releases of Hazardous Materials (a) from any assets, properties or businesses owned or operated by any Seller or any of its subsidiaries or any predecessor in interest; (b) from adjoining properties or businesses; or (c) onto any facilities which received Hazardous Materials generated by any Seller or any of its subsidiaries or any predecessor in interest.

"Environmental Laws" means the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, *et seq.*), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Federal Clean Water Act (33 U.S.C. § 1251 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Toxic Substances Control Act (15 U.S.C. § 2601 *et seq.*) and the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), as such Laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, rule, regulation, Order, judgment, decree, Permit, license or other binding determination of any Governmental Body imposing liability or establishing standards of conduct for protection of the environment or other government restrictions relating to the protection of the environment or the Release, deposit or migration of any Hazardous Materials into the environment.

4

"Environmental Liabilities and Costs" means all liabilities, monetary obligations, Remedial Actions, losses, damages, punitive damages, consequential damages, treble damages, fees, costs and expenses (including all fees, costs and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Body or any third party, and which relate to any environmental condition or a Release of Hazardous Materials from or onto (i) any property presently or formerly owned by any Seller or any of its subsidiaries or (ii) any facility which received Hazardous Materials generated by any Seller or any of its subsidiaries.

"Environmental Lien" means any Lien in favor of any Governmental Body for Environmental Liabilities and Costs.

"Environmental Offset Amount" has the meaning ascribed to such term in the Pemco Stock Purchase Agreement.

"ERISA Affiliate" means any entity that with the subject Person is:

(a)     a member of a controlled group of corporations within the meaning of Section 414(b) of the Tax Code;

(b)     a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Tax Code;

(c)     a member of an affiliated service group within the meaning of Section 414(m) of the Tax Code; or

(d)     a member of a group of organizations required to be aggregated under Section 414(o) of the Tax Code.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning ascribed to such term in Section 2.2.

"Excluded Liabilities" has the meaning ascribed to such term in Section 2.4.

"Executory Contract Assumption Order" means a Final Order of the Bankruptcy Court, acceptable to Purchaser in its sole and absolute discretion, approving the assumption of the Assumed Executory Contracts by Sellers, and the assignment by Sellers of the Assumed Executory Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code (which Order may be the Sale Order).

"Executory Contract" means any Contract to which any Seller is a party that is executory as that term is used in Section 365 of the Bankruptcy Code.

"Facility Lease" means the lease by and between the Birmingham Airport Authority, as successor in interest to the City of Birmingham, Alabama, and AAII –

Birmingham, successor in interest to Hayes Aircraft Corporation, dated as of January 1, 1957, as amended by amendments dated January 3, 1961, September 5, 1961, June 18, 1963, October 11, 1966, November 30, 1966, February 16, 1967, January 29, 1971, June 23, 1971, November 27, 1972, November 30, 1973, August 7, 1974, July 12, 1979, February 27, 1998, June 21, 1999 and November 4, 2010.

"Final Order" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, supplies, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers in the conduct of the Business, including, without limitation, all owned artwork, desks, chairs, tables, computer systems, Software, hardware, photo processing equipment, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, warehouse equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles.

"GECAS Judgment" means any and all rights in and to the judgment in favor of AAII and Pemco World Air Services, Inc. against GE Capital Aviation Services, Inc. in the Circuit Court of Dale County, Alabama (Case No. CV-2004-17), which judgment is currently on appeal and pending before the Supreme Court of the State of Alabama (No. 1090350), as the same may be modified, amended, or overturned, in whole or in part.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Material" means (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause immediately, or at some future time, harm to or have an adverse effect on, the environment or risk to human health or safety, including, without limitation, any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including, without limitation, corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including, without limitation, asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

"Intellectual Property" means all intellectual property and intellectual property rights of Sellers used in connection with the Business, including, without limitation, the

following:  (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, (iv) all Software, (v) internet addresses, uniform resource locators, web sites and web pages, (vi) confidential information, know-how, trade secrets and inventions and (vii) all other intellectual property.

"Interest" shall mean an "interest in property" as such phrase is used in Section 363(f) of the Bankruptcy Code.

"Inventory" means any and all supplies, fuel, raw materials, spare parts, finished and unfinished goods, saleable or other items of inventory owned by Sellers and used in connection with the Business.

"Law" means any federal, state, local, municipal, foreign or other law, statute, constitution, principle of common law, resolution, ordinance, rule, regulation, code, Order or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"Lease" means any unexpired lease to which any Seller is a party as that term is used in Section 365 of the Bankruptcy Code, including the Facility Lease.

"Lease Assumption Order" means a Final Order of the Bankruptcy Court that is acceptable to Purchaser in its sole and absolute discretion, approving the assumption of the Assumed Leases by Sellers, and the assignment by Sellers of the Assumed Leases to Purchaser, pursuant to section 365 of the Bankruptcy Code (which Order may be the Sale Order).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or not accrued, liquidated or unliquidated, or due or to become due), and including all fees, costs and expenses relating thereto.

"Lien" means any charge against or interest in property to secure payment of a debt (as such term is defined in section 101(12) of the Bankruptcy Code) or performance of an obligation.

"Litigation Trust" has the meaning ascribed to such term in Section 10.1(i).

"Litigation Trust Agreement" means the agreement establishing the Litigation Trust.

"Litigation Trust Net Recovery" means the proceeds from the liquidation of the Trust Causes of Action net of professional fees and other fees, costs and expenses associated with the liquidation of the Trust Causes of Action.

"Litigation Trust Participation Amount" has the meaning ascribed to such term in Section 3.1.

"Material Adverse Effect" means, with respect to any party hereto, a material adverse effect on the business, assets, financial condition, results of operations or properties of such party, and its subsidiaries, taken as a whole, or the ability of such party to comply with its material obligations under this Agreement or to consummate the Transactions.

"Order" means any order, injunction, judgment, edict, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Payment" has the meaning ascribed to such term in Section 3.2(a).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pemco" has the meaning ascribed to such term in the Preamble.

"Pemco Stock Purchase Agreement" means the Stock Purchase Agreement dated July 10, 2007 between WAS Aviation Services, Inc. and Pemco World Air Services, Inc.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means, with respect to or upon any of the Purchased Assets, whether owned as of the date hereof or hereafter, (i) all defects, exceptions, restrictions, easements, rights of way and Encumbrances of record in Jefferson County, Alabama, to the extent same pertain to a Purchased Asset and which would not individually (or in the aggregate with others) be reasonably expected to materially and adversely affect the use or enjoyment of such property or asset; (ii) any statutory liens for Taxes, assessments or other governmental charges that are not yet due and payable; (iii) mechanics', carriers', workers' and repairers' liens and similar Encumbrances, arising in the ordinary course of business securing obligations that are not yet due; and (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated.

"Person" has the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

"Prepaids" means, as of a particular date, all deposits with vendors or suppliers, and all prepaid expenses, claims for refunds and rights to offset of Sellers that relate to the Purchased Assets.

"Prospective Employee" has the meaning ascribed to such term in Section 9.2.

"Purchased Assets" has the meaning ascribed to such term in Section 2.1(b).

8

"Purchase Price" has the meaning ascribed to such term in Section 3.1.

"Purchaser" has the meaning ascribed to such term in the Preamble.

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

"Sale Motion" means the motion to be filed by the Sellers in the Bankruptcy Case, requesting, among other things, entry of the Sale Order, the Lease Assumption Order and the Executory Contract Assumption Order, as the same may be modified or amended.

"Sale Order" means an Order of the Bankruptcy Court, in the form attached hereto as Exhibit D or as otherwise approved by Purchaser, SVBF, and the PBGC in each of their sole and absolute discretion, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Purchaser of all of the Purchased Assets, and approving and authorizing Sellers to consummate the Transactions contemplated hereby.

"Sellers" has the meaning ascribed to such term in the Preamble.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise that are specific to Sellers, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) custom screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"SVBF" means Special Value Bond Fund, LLC.

"Tax Authority" means any Governmental Body charged with the administration of any Law relating to Taxes.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Tax Code, or by contract, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Transactions" has the meaning ascribed to such term in the Recitals.

"Termination Date" shall have the meaning ascribed to such term in Section 4.4(a).

"Transfer Taxes" means any transfer, registration, stamp, documentary, sales, use or similar Tax assessed in connection with the transfer of the Purchased Assets, all such Taxes (including, but not limited to all applicable real estate transfer), any penalties, interest and additions to tax, and court, registration and filing fees incurred in connection with the Transactions.

"Trust Causes of Action" means all Causes of Action of Sellers or their estates, but specifically excluding any Causes of Action of Sellers relating to (i) warranty claims or breach of contract claims with respect to Inventory, Furniture and Equipment that constitute Purchased Assets, (ii) the collection of any Accounts Receivable or other similar rights of collection, including Sellers' rights to collect Work in Process as set forth in this Agreement, (iii) Avoidance Actions, (iv) the GECAS Judgment, (v) Causes of Action specifically identified and allocated between Purchaser and Sellers pursuant to this Agreement, and (vi) this Agreement.

"Union" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and its Local Union 1155.

"WARN Act" means the Worker Adjustment and Retraining Notification Act.

"Work in Process" all direct and indirect costs reflected by Sellers on their books and records as an unreimbursed cost of a project relating to the Business for which revenue has not been recognized by Sellers, which costs shall be reimbursed by Purchaser to Sellers upon Purchaser's receipt by of payment therefor in the same relative proportion that the work performed by Sellers bears to the overall work for which such payment is made.

10

1.2.   Other Definitional and Interpretive Matters.

(a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)   Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)   Dollars. Any reference in this Agreement to $ means U.S. dollars.

(iii)   Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. The Exhibits and Schedules attached to this Agreement are as follows:

| Exhibit / Schedule | Description |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Lease Assignment and Assumption Agreement |
| Exhibit D | Form of Sale Order |
| Schedule 1-A | Assumed Executory Contracts |
| Schedule 1-B | Assumed Leases |
| Schedule 2.1(b)(xi) | Excluded Insurance Policies |
| Schedule 2.1(b)(xix) | Additional Purchased Assets |
| Schedule 2.2(l) | Additional Excluded Assets |
| Schedule 2.5 | All Executory Contracts and Leases |
| Schedule 3.2(a) | Wire Instructions |
| Schedule 5.8 | Permits |
| Schedule 5.11 | Taxes |
| Schedule 5.12(a) | Collective Bargaining Agreements |
| Schedule 5.12(b) | Labor Matters |
| Schedule 5.12(f) | Employees |
| Schedule 5.13 | Environmental Matters |

(iv)   Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)   Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)   Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)   Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)   Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS;
## ASSUMPTION OF LIABILITIES

2.1.   Purchase and Sale of Assets.

(a)   On the terms and subject to the conditions set forth in this Agreement, at the Closing, to the fullest extent permitted by sections 105, 363 and 365 of the Bankruptcy Code, Purchaser shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, convey and deliver to Purchaser, all of Sellers' right, title and interest in, to and under the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances other than those created or granted by Purchaser and other than Permitted Exceptions.  Without limiting the foregoing, the conveyance of the Purchased Assets by Sellers contemplated by this Section 2.1 and otherwise by this Agreement shall be made by Sellers free and clear of any and all liability (including contingent liability) of Sellers or any ERISA Affiliate that has arisen or may arise under or in connection with section 1306(a)(7) of title 29 of the United States Code or the CBA.

(b)   For all purposes of and under this Agreement, the term "Purchased Assets" means all of the properties, assets, and rights of Sellers (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible, including, but not limited to:

(i)   all Inventory as of the Closing Date;

(ii)   all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(iii)   the Assumed Executory Contracts and the Assumed Leases, together with Sellers' interest in all security and other deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Lease;

(iv)   all Furniture and Equipment;

(v)   (A) all rights in and to Intellectual Property rights owned or licensed by Sellers, to the broadest extent Sellers are permitted by Law to transfer such

12

Intellectual Property, and (B) to the extent such Intellectual Property may not be transferred to Purchaser by Law or otherwise, Sellers shall be deemed to have granted to Purchaser an exclusive, perpetual, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by Law and Sellers shall use best efforts to obtain any necessary consents to comply with this Section 2.1(b)(v);

(vi) all Documents in Sellers' possession that are used in, held for use in or intended to be used in, or that arise in whole or in part out of, the Business and operations of Sellers, but excluding any Documents exclusively related to an Excluded Asset;

(vii) all Permits used by Sellers that relate to the Purchased Assets or the Business, to the extent assignable;

(viii) ninety percent (90%) of the Litigation Trust Net Recovery until the Sellers have received an aggregate distribution from the Litigation Trust of Thirty Million Dollars ($30,000,000) and one hundred percent (100%) of the Litigation Trust Net Recovery after the Sellers have received an aggregate distribution from the Litigation Trust of Thirty Million Dollars ($30,000,000);

(ix) the Environmental Offset Amount;

(x) all Prepaids;

(xi) to the extent transferable, all insurance policies or rights to proceeds thereof relating to the Purchased Assets other than those set forth on Schedule 2.1(b)(xi) to this Agreement;

(xii) all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(xiii) all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and relating to products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(xiv) Causes of Action consisting of (A) Avoidance Actions relating to the Assumed Executory Contracts and Assumed Leases and (B) warranty claims or breach of contract claims with respect to Inventory, Furniture and Equipment that constitute Purchased Assets;

(xv) all customer deposits or amounts prepaid by customers under any Assumed Executory Contract;

(xvi) to the extent transferable, all Tax credits of Sellers;

13

(xvii)   any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records, Tax Returns, financial statements and corporate or other entity filings; provided, that Purchaser shall provide Sellers with reasonable access to or, at the expense of Sellers, copies of any documents described in this Section 2.1(b)(xvii);

(xviii)   any intercompany receivables; and

(xix)   the assets set forth on Schedule 2.1(b)(xix).

2.2.   Excluded Assets.  Notwithstanding anything to the contrary contained herein, Sellers shall not sell, transfer or convey, Purchaser shall not purchase, acquire or accept, and the Purchased Assets shall not include any Excluded Asset. Sellers shall retain all right, title and interest to, in and under the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a)   the GECAS Judgment, Avoidance Actions other than the Avoidance Actions described in Section 2.1(b)(xiv)(A) and any Causes of Action relating to (i) collection of any Account Receivable or other similar rights of collection, including Sellers' rights to collect Work in Process as set forth in this Agreement and (ii) Sellers' rights under this Agreement;

(b)   all cash and cash equivalents of the Sellers and their bankruptcy estates, including all rights of Sellers and their bankruptcy estates in and to any escrow or trust agreements (but excluding any customer deposits or amounts prepaid by customers under any Assumed Executory Contract and (ii) the Environmental Offset Amount);

(c)   the assets and properties used in the Business that have been disposed of since the date of this Agreement in the ordinary course of business, provided such disposition has been made in accordance with the terms hereof;

(d)   the CBA and all Contracts other than the Assumed Executory Contracts and the Assumed Leases;

(e)   all attorney/client privileges and other privileges of any kind related to any Excluded Asset;

(f)   any shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller;

(g)   any Employee Benefit Plan;

(h)   all of Sellers' right, title and interest to any Tax refunds on account of taxable periods ending prior to the Closing Date;

(i)   all Accounts Receivable as of the Closing Date;

(j)   all Work in Process as of the Closing Date;

14

    (k)    any rights of Sellers under this Agreement; and

    (l)    the assets set forth on <u>Schedule 2.2(l)</u>.

    2.3.    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "<u>Assumed Liabilities</u>") and no others:

    (a)    payment of the Cure Costs; and

    (b)    all Liabilities arising out of the ownership of the Purchased Assets or the operation of the Business on and after the Closing Date.

    2.4.    <u>Excluded Liabilities</u>.  On and subject to the terms and conditions of this Agreement, Purchaser shall assume and become responsible for all of the Assumed Liabilities at the Closing.  Purchaser will not assume or have any responsibility, however, with respect to any other obligation or Liability of Sellers not included within the definition of Assumed Liabilities, including, without limitation: (i) Taxes (x) imposed on any Seller for any period or (y) related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing; (ii) any fees, costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees, costs and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases; (iii) Liabilities to the extent relating to the Excluded Assets, including Liabilities relating to Excluded Contracts; (iv) Liabilities and obligations of Sellers under this Agreement; (v) other than the Cure Costs, all Liabilities and obligations arising under any Assumed Executory Contract or Assumed Lease (and all Liabilities for any breach, act or omission under any Assumed Executory Contract or Assumed Lease) arising prior to the Closing; (vi) all obligations, Liabilities and indebtedness, including any note indebtedness, owed by any Seller to any affiliate of any Seller or to any third party; (vii) any obligations to any employee of any Seller arising out of such employee's employment by such Seller prior to the Closing; (viii) any Claim of any employee of any Seller arising out of such employee's employment by such Seller prior to the Closing; (ix) any WARN Act Liabilities; (x) all Liabilities and obligations of Sellers under the CBA; (xi) all Liabilities and obligations of Sellers to the PBGC with respect to any Employee Benefit Plan; (xii) any secured or unsecured Claims against Sellers or their estates; and (xiii) all other Liabilities and obligations for which Purchaser does not expressly assume any Liability hereunder (collectively, the "<u>Excluded Liabilities</u>").

    2.5.    <u>Executory Contracts and Unexpired Leases</u>.  <u>Schedule 1-A</u> and <u>Schedule 1-B</u> contain the current list of Executory Contracts and Leases that Purchaser requires that Sellers assume and assign to Purchaser at Closing.  Notwithstanding the foregoing, Purchaser shall have the right to unilaterally modify <u>Schedule 1-A</u> and <u>Schedule 1-B</u> to add or remove Executory Contracts and Leases by providing Seller with a substitute <u>Schedule 1-A</u> or <u>Schedule 1-B</u>, as the case may be, at any time prior to the conclusion of the hearing approving the Sale Order.  Upon conclusion of the hearing approving the Sale Order, <u>Schedule 1-A</u> and <u>Schedule 1-B</u>, as same may have been modified from time to time, shall be deemed final.  Not later than the commencement of the hearing approving the Sale Order, Sellers shall deliver a schedule to

Purchaser listing all Executory Contracts and Leases of Sellers (whether or not such Executory Contracts and Leases are to be assumed and assigned).

2.6.   Further Conveyances, Assumptions and Cooperation.

(a)   Following the Closing, Sellers shall transfer to Purchaser any Purchased Assets received by or in the possession of Sellers.

(b)   Following the Closing, Purchaser shall transfer to Sellers any Excluded Assets received by or in the possession of Purchaser.

(c)   Following the Closing, Sellers and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Sellers and their respective successors and assigns, the assumption of the Assumed Liabilities by Purchaser under this Agreement, and to otherwise make effective the Transactions.

(d)   After the Closing the Sellers hereby agree to reasonably cooperate and assist the Purchaser in obtaining the transfer of any permits, licenses or other approvals of any Governmental Body or agency required to commence conduct of the business formerly conducted by the Sellers.

(e)   After the Closing the Purchasers will provide reasonable access to Sellers to documents and other corporate records necessary for Sellers to administer the Bankruptcy Case.

### ARTICLE III
### CONSIDERATION

3.1.   Consideration.   The purchase price for the Purchased Assets shall be the sum of (i) cash equal to Five Hundred Thousand Dollars ($500,000) (the "Purchase Price"), payable as provided by Section 3.2, plus (ii) the Purchaser's assumption of the Assumed Liabilities, plus (iii) ten percent (10%) of the Litigation Trust Net Recovery, not to exceed Thirty Million Dollars ($30,000,000) (the "Litigation Trust Participation Amount").

3.2.   Payment of the Purchase Price.

(a)   On the Closing Date, Purchaser shall pay and deliver the cash portion of the Purchase Price (Five Hundred Thousand Dollars ($500,000)) (the "Payment") to Sellers by wire transfer of immediately available funds using the wire instructions set forth in Schedule 3.2(a).

(b)   On the Closing Date, in addition to the Purchase Price, Purchaser shall assume the obligation to pay all Cure Costs.

3.3.   Distribution of the Litigation Trust Participation Amount. The Litigation Trust Agreement shall provide that the Litigation Trust Participation Amount shall be distributed to Sellers at the same time as and on the same terms as distributions are made to the Purchaser from the Litigation Trust.

**ARTICLE IV**
**CLOSING AND TERMINATION**

4.1.   Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place at the offices of Sellers' counsel (or at such other place as the parties may designate) at 10:00 a.m. (prevailing Eastern Time) on the date the conditions set forth in Article X are satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order, unless extended by Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."

4.2.   Deliveries by Sellers. At the Closing, Sellers shall deliver to Purchaser:

(a)   a bill of sale in the form attached hereto as Exhibit A (the "Bill of Sale"), duly executed by Sellers;

(b)   an assignment and assumption agreement in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by Sellers;

(c)   the Lease Assignment and Assumption Agreement in the form attached hereto as Exhibit C, duly executed by Sellers;

(d)   an affidavit executed by each Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Tax Code;

(e)   all customer deposits or other security or collateral related to any Assumed Executory Contract;

(f)   all consents necessary for the assumption and assignment of the Assumed Executory Contracts and Assumed Leases by Sellers to Purchaser;

(g)   the officer's certificates required to be delivered pursuant to Sections 10.1(a), (b) and (d); and

(h)   such other documents, instruments and agreements as reasonably requested by Purchaser, duly executed by Sellers.

4.3.   Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Sellers:

(a)   the Payment;

17

(b)     the Bill of Sale, duly executed by Purchaser;

(c)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)     the Lease Assignment and Assumption Agreement, duly executed by Purchaser;

(e)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and (b); and

(f)     such other documents, instruments and agreements as reasonably requested by Sellers, duly executed by Purchaser.

4.4.    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Sellers, if the Closing shall not have occurred by 5 p.m. (EDT) on September 13, 2011 (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the such date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Sellers, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

(b)     by mutual written consent of Sellers, on the one hand, and Purchaser, on the other;

(c)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 10.1 or 10.3 shall have become incapable of fulfillment or shall be unsatisfied as of the scheduled Closing Date, other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d)     by Sellers, if any condition to the obligations of Sellers set forth in Section 10.2 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(e)     by Sellers or Purchaser if there shall be in effect a Final Order or other nonappealable final action of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of the Transactions contemplated hereby;

(f)     by Purchaser, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or Section 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by Purchaser to Sellers of such breach and (ii) the Termination Date;

(g)     by Sellers, if there shall be a material breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 10.2</u> or <u>Section 10.3</u> and which breach cannot be cured or has not been cured by the earlier of (i) five (5) Business Days after the giving of written notice by Sellers to Purchaser of such breach and (ii) the Termination Date;

(h)     by Purchaser or Sellers, if the Bankruptcy Court approves any purchase offer other than the offer submitted by Purchaser and the transaction contemplated by such purchase offer is thereafter consummated;

(i)     by Purchaser, if Sellers withdraw or seek authority to withdraw the Sale Motion, or announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other party);

(j)     by Purchaser, if the Sale Order, the Lease Assumption Order and the Executory Contract Assumption Order have not each been entered on or before September 12, 2011;

(k)     by Purchaser, upon the occurrence of a Material Adverse Effect relating to Sellers and/or the Business; or

(l)     by Purchaser until the earlier of: (i) the conclusion of the hearing approving the Sale Order, and (ii) August 31, 2011, if in its sole and absolute discretion, it is not satisfied with the results of its due diligence review, inspection, analysis and investigations of the Purchased Assets, the Business and the Sellers.

4.5.    <u>Procedure Upon Termination</u>.  In the event of termination pursuant to <u>Section 4.4</u> hereof, written notice thereof shall forthwith be given to the other party or parties, and Sellers shall subsequently provide written notice thereof to the Committee, the PBGC, and SVBF and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Sellers.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the Transactions, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6.    <u>Effect of Termination</u>.  In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or any Seller; provided, however, that the provisions of this <u>Section 4.6</u>, <u>Section 4.7</u> and <u>Article XII</u> hereof shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this <u>Section 4.6</u> shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Unless otherwise stated specifically to the contrary in this Agreement, the representations and warranties set forth in this Article V shall not survive Closing. Sellers hereby jointly and severally represent and warrant to Purchaser that:

5.1.    Organization and Good Standing.  Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in each jurisdiction where it is qualified to do business, and subject to the limitations imposed on Sellers as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2.    Authorization of Agreement.  Subject to entry of the Sale Order, the Lease Assumption Order and the Executory Contracts Assumption Order, each Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which each Seller is a party and the consummation by it of the Transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of such Seller, constitute legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3.    Conflicts; Consents of Third Parties.

(a)    The execution and delivery by Sellers of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which any Seller is a party, the consummation by Sellers of the Transactions contemplated hereby and thereby, or compliance by Sellers with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, the Lease Assumption Order and the Executory Contract Assumption Order (A) any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (B) any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (C) any applicable Law.

(b)    Subject to the entry of the Sale Order, the Lease Assumption Order and the Executory Contracts Assumption Order, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it any Seller is a party, the compliance by Sellers with any of the provisions hereof or

20

thereof, the consummation by Sellers of the transactions contemplated hereby or thereby, the assignment or conveyance of the Purchased Assets, or the taking by Sellers of any other action contemplated hereby or thereby, except in each case for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.4.    Title to Purchased Assets. Sellers have good and marketable title (or with respect to the Assumed Leases, a valid leasehold interest) to the Purchased Assets, and subject to the entry of the Sale Order, the Lease Assumption Order and the Executory Contracts Assumption Order, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.5.    Intellectual Property. To Sellers' knowledge, Sellers own all right, title and interest to, or are licensees with respect to, the Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order. To the knowledge of Sellers, (i) no Person is engaging in any activity that infringes any Intellectual Property and (ii) no Claim has been asserted to any Seller that the use of any Intellectual Property or the operation of the Business infringes or violates the intellectual property of any third party. The Intellectual Property and the rights under the Assumed Executory Contracts include the rights to use all intellectual property required to operate the Business as currently conducted.

5.6.    Litigation. Other than in connection with the Bankruptcy Cases, there is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Sellers' knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or Order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, might adversely affect the ability of any Seller to enter into this Agreement or to consummate the Transactions contemplated hereby and Sellers have no knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

5.7.    Compliance with Laws. Sellers have conducted and are presently conducting the Business in compliance with all applicable Laws (including, without limitation, all Environmental Laws), except where such non-compliance would not result in a Material Adverse Effect.

5.8.    Permits. Schedule 5.8 sets forth all material Permits used by Sellers in the Business. Sellers are in compliance with the material terms of all such Permits, and all such Permits are valid and in full force and effect, and no proceeding is pending or, to the knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

5.9.   Inventory.

(a)   No Inventory is materially damaged in any significant way, including, but not limited, to damage caused by water, except for any such damage which would not have a Material Adverse Effect on the Inventory taken as a whole;

(b)   To Sellers' knowledge, the Inventory has not been part of a current or past product recall;

(c)   The Inventory is in material compliance with United States federal guidelines for such products as of the date hereof, except for such compliance failure which would not have a Material Adverse Effect on the Inventory taken as a whole; and

(d)   The Inventory is in working condition except for such failure to be in working condition which would not have a Material Adverse Effect on the Inventory taken as a whole.

5.10.   Contracts. Other than the CBA, the Assumed Executory Contracts and the Assumed Leases include all Contracts material to the ownership and/or operation of the Business. Sellers have not, and, to Sellers' knowledge, no other party to any Assumed Executory Contract or Assumed Lease has, commenced any action against any of the parties to any Assumed Executory Contract or Assumed Lease or given or received any written notice of any default or violation under any Assumed Executory Contract or Assumed Lease that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Costs. Each Assumed Executory Contract and Assumed Lease is, or will be upon the Closing, valid, binding and in full force and effect in accordance with its terms.

5.11.   Taxes. Except as set forth on Schedule 5.11:

(a)   Since January 1, 2008, all income Tax Returns required to have been filed by Sellers (for which the time for filing has passed) have been duly filed;

(b)   To the knowledge of Sellers, no federal or state income Tax Return audits are pending with respect to any Seller;

(c)   No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(d)   Other than with respect to Liens asserted by the PBGC, there are no material liens with respect to Taxes upon any of the Purchased Assets, other than (i) Permitted Exceptions and (ii) Liens that may arise to the extent payment of such Taxes is stayed as a result of the Bankruptcy Cases; and

(e)   No Seller has (i) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (ii) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof;

22

in each case other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business.

    5.12.   Labor Matters.

       (a)    Other than with respect to the CBA and those collective bargaining agreements set forth in Schedule 5.12(a), (i) no Seller is a party to any labor or collective bargaining agreement with respect to its employees, (ii) no employee of any Seller is represented by any labor organization, (iii) no labor organization or group of employees of any Seller has made a pending demand for recognition or request for certification, (iv) and there are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

       (b)    Other than as set forth on Schedule 5.12(b), there are no strikes, lockouts, work stoppages or slowdowns pending or, to the knowledge of Sellers, threatened against or involving any Seller.

       (c)    There are no unfair labor practice charges, arbitrations, grievances or complaints pending or, to the knowledge of Sellers, threatened in writing against any Seller relating to the employment or termination of employment of any individual by any Seller except those which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

       (d)    There are no complaints, charges, administrative proceedings or claims against any Seller pending or, to the knowledge of Sellers, threatened in writing to be brought or filed with any Governmental Body based on or arising out of the employment by any Seller of any employee except those which, individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

       (e)    Purchaser shall not incur any liability or obligation under the WARN Act or similar state Laws as a result of actions taken by Sellers prior to Closing.

       (f)    Except as set forth on Schedule 5.12(f), the employment of each employee of Sellers is at-will. Schedule 5.12(f) lists all written (and includes a summary of all legally binding oral) employment and consulting agreements to which any Seller is a party or by which it is bound. Complete and correct copies of the agreements or arrangements listed and summarized on Schedule 5.12(f) have been provided or made available to Purchaser.

    5.13.   Environmental Matters. Except as set forth on Schedule 5.13, (i) the operations of each Seller are in compliance with all Environmental Laws; (ii) there has been no Release at any of the properties owned or operated by any Seller or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Seller or any predecessor in interest, which could have a Material Adverse Effect; (iii) no Environmental Action has been asserted against any Seller or any predecessor in interest nor does any Seller have knowledge or notice of any threatened or pending Environmental Action against any Seller or any predecessor in interest which could have a Material Adverse Effect; (iv) no Environmental Actions have been asserted against any facilities that may have received

23

Hazardous Materials generated by any Seller or any predecessor in interest which could have a Material Adverse Effect; (v) no property now or formerly owned or operated by a Seller has been used as a treatment or disposal site for any Hazardous Material; (vi) no Seller has failed to report to the proper Governmental Body any Release which is required to be so reported by any Environmental Laws which could have a Material Adverse Effect; (vii) each Seller holds all licenses, Permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, Permits and approvals as to which a Seller's failure to maintain or comply with could not have a Material Adverse Effect; and (viii) no Seller has received any notification pursuant to any Environmental Laws that (A) any work, repairs, construction or capital expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, Permit or approval issued pursuant thereto or (B) any license, Permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not have a Material Adverse Effect.

5.14.   Brokers.  Except with respect to Macquarie Capital USA, Inc., no Seller has any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions. Purchaser has no liability to Macquarie Capital USA, Inc. or any other broker, finder, investment banker, financial advisor or other similar Person acting on behalf of any Seller.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Unless otherwise stated specifically to the contrary in this Agreement, the representations and warranties set forth in this Article VI shall not survive Closing.  Purchaser hereby represents and warrants to Sellers that:

6.1.   Organization and Good Standing.  Purchaser is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2.   Authorization of Agreement.  Purchaser has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of it.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party has been duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other parties hereto) constitute legal, valid and binding obligations of it enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of

24