commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3.   Conflicts; Consents of Third Parties.

(a)   The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation by it of the transactions contemplated hereby and thereby, and compliance by it with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) its organizational documents; (ii) any Contract, lease or Permit to which it is a party or by which any of its properties or assets are bound; (iii) any Order of any Governmental Body applicable to it or any of its properties or assets as of the date hereof; or (iv) any applicable Law.

(b)   No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by it with any of the provisions hereof or thereof, the consummation by it of the transactions contemplated hereby or thereby, its taking of any other action contemplated hereby or thereby, except, in each case, for such consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.4.   Financing.  Purchaser will have at the Closing sufficient funds available to pay the Purchase Price and to pay all fees and expenses related to the Transactions payable by it.

6.5.   Brokers.  Purchaser does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions.  No Seller has any liability to any broker, finder, investment banker, financial advisor or other similar Person acting on behalf of Purchaser.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1.   Bankruptcy Court Approval.  This Agreement is subject to entry of the Sale Order by the Bankruptcy Court and Sellers shall use commercially reasonable efforts to seek entry of such Sale Order.

7.2.   Bankruptcy Court Filings.  Sellers and Purchaser shall take reasonable actions necessary to obtain entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

## ARTICLE VIII
## COVENANTS

8.1.    Access to Information.

(a)    Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, business and operations of Sellers and such examination of the books and records and financial and operating data of Sellers, the Business, and the Purchased Assets, and access to all the officers, key employees, accountants and other representatives of Sellers, as it reasonably requests and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice to Sellers and under reasonable circumstances during normal business hours. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation, examination and access, and Purchaser and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to Sellers' business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Sellers to disclose information subject to attorney-client privilege, provided Sellers advise Purchaser of the specific assertion of such privilege. In addition, Sellers shall cooperate with Purchaser in coordinating any desired discussions between Purchaser and any customers of Sellers (including governmental entities) or governmental entities (in connection with economic development purposes) any time between the date hereof and the Closing. Upon request, Sellers shall cooperate with Purchaser so that Purchaser may, at its sole cost and expense, obtain an environmental report with respect to real property covered by the Facility Lease.

(b)    Purchaser agrees that, after the Closing Date, Sellers shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to be given reasonable access (and be permitted to make copies) to the books and records, Documents and any other Purchased Assets that Sellers deem necessary or appropriate related to the Bankruptcy Case, including, without limitation, any litigation commenced or continued with respect to any Excluded Asset at Sellers' expense. Purchaser shall cause its respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Sellers and Sellers' representatives in connection with such examination and access, and Sellers and their representatives shall cooperate with Purchaser and its respective representatives and shall use their reasonable efforts to minimize any disruption to Purchasers' business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Purchaser to disclose information subject to attorney-client privilege, provided Purchaser advises Sellers of the specific assertion of such privilege.

8.2.    Conduct Pending the Closing. Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in compliance with the Cash Collateral Order. Sellers shall use commercially reasonable efforts, subject to and

in compliance with the Cash Collateral Order, to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), and (E) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers. Without limiting the generality of the foregoing, and except (i) as otherwise expressly provided in or contemplated by this Agreement, or (ii) required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, on or prior to the Closing Date, Sellers may not, without the prior written consent of Purchaser, take any of the following actions with respect to the Business:

(a)   modify in any manner the compensation of any of their employees or officers, or accelerate the payment of any such compensation (other than in the ordinary course of business or such that the liability associated with such modification is excluded from the Assumed Liabilities);

(b)   engage any new employee other than in the ordinary course of business, provided, however, that Sellers shall not engage any new employee whose aggregate annual compensation exceeds $75,000;

(c)   remove or permit to be removed from any building, facility, or real property any asset or any Inventory (other than in connection with the sale of Inventory in the ordinary course of business);

(d)   sell, lease or otherwise dispose of, mortgage, hypothecate or otherwise encumber any asset (other than sales of Inventory in the ordinary course of business);

(e)   enter into, amend, terminate or renew any Contract other than in the ordinary course of business; provided, that any such Contract amendment, termination or renewal shall not increase the term of any such Contract by more than one (1) year or result in an obligation of any Seller in excess of $100,000;

(f)   fail to pay any required filing, processing or other fee, or fail to use commercially reasonable efforts to maintain the validity of Sellers' rights in, to or under any Intellectual Property;

(g)   fail to use commercially reasonable efforts to maintain all Permits of Sellers, including those used in the operation of the Business;

(h)   other than as set forth in Section 8.2(a), increase the salaries or other compensation payable to any of Sellers' directors, officers or employees;

(i)   make any change in their method of accounting, except in accordance with GAAP;

(j)     return Inventory with an aggregate value of more than $10,000 to any single vendor;

(k)     fail to maintain any insurance policy in effect on the date hereof or amend any such policy other than extensions in the ordinary course of business;

(l)     permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned or leased by any Seller or any of its subsidiaries, except in compliance with all Environmental Laws; and

(m)     agree, whether in writing or otherwise, to do any of the foregoing.

8.3.   Confidentiality.

(a)     Purchaser acknowledge that the confidential information provided to it in connection with this Agreement and the consummation of the Transactions contemplated hereby, is subject to the terms and conditions of that certain Confidentiality Agreement among the parties dated as of April 27, 2011.

(b)     Following the date hereof, Sellers agree to maintain, and shall cause their respective affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective affiliate's possession or of which Sellers or any of their respective affiliates are aware. Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft. In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3(b) or information not otherwise known by Sellers that becomes available to any Seller from a Person other than Purchaser, or (b) any of the discussions or negotiations conducted with Purchaser in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, and parties in interest in the Bankruptcy Cases, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding or Governmental Body, or (iii) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.

8.4.   Section 363(b)(1)(A).   Purchaser shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

8.5.    Adequate Assurances Regarding Assumed Executory Contracts and Assumed Leases.  With respect to each Assumed Executory Contract and Assumed Lease, Purchaser shall provide adequate assurance of the future performance of such Assumed Executory Contract and Assumed Lease by Purchaser as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

8.6.    Material Adverse Effect.  Sellers shall promptly inform Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect on Sellers and/or the Business.

8.7.    Name Change.  Within twenty-one (21) days after the Closing, the Sellers shall take all steps necessary to effect a change in their respective corporate names to remove the words "Alabama Aircraft" from such names.

8.8.    Prorations.  Rent, current Taxes, prepaid advertising, utilities and other items of expense (including, without limitation, any prepaid insurance, maintenance, tax or common area or like payments under the Assumed Leases or Assumed Executory Contracts) relating to or attributable to the Business and/or the Purchased Assets shall be prorated between Sellers and Purchaser as of the Closing Date. All liabilities and obligations due in respect of periods prior to or as of the Closing Date shall be paid in full or otherwise satisfied by Sellers (provided that nothing herein shall require Sellers to make payments on account of prepetition claims) and all liabilities and obligations due in respect of periods after the Closing Date shall be paid in full or otherwise satisfied by Purchaser; provided, that Purchaser shall have no obligation to reimburse Sellers for any payments made by Sellers prior to Closing on account of the liabilities and obligations described in this Section 8.8. Rent shall be prorated on the basis of actual days elapsed. If the exact amount of any liabilities and obligations described in this Section 8.8 is not known on the Closing Date, the apportionment shall be based upon reasonable estimates made in good faith, without subsequent adjustment.

8.9.    Consents.  Sellers shall use their commercially reasonable efforts, and Purchaser shall cooperate with Sellers, to obtain at the earliest practicable date all consents and approvals required to consummate the Transactions.

8.10.    Further Assurances.  Subject to the other provisions of this Agreement, Purchaser and Sellers shall use their commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

8.11.    Preservation of Records.  Sellers and Purchaser agree that each of them shall preserve and keep the records held by it or them relating to the Purchased Assets for two years after the Closing Date (except as provided below) and shall make such records available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Purchaser or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby.  In the event any Seller or Purchaser wishes to destroy such records before

or within two years, such party shall first give ninety (90) days prior written notice to the other parties and such other parties shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within such ninety (90) day period.

8.12.   Publicity.   None of the parties hereto shall issue any press release concerning this Agreement or the Transactions without obtaining the prior written approval of the other parties hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.

8.13.   Payment of Taxes.   Purchaser shall not be responsible for paying or otherwise discharging any of Sellers' Taxes for all periods (or portions thereof) ending on or prior to the Closing Date or for preparing or filing any Tax Returns and other similar instruments in connection therewith.

8.14.   Motions, Orders, etc.   Sellers shall use best efforts to obtain Bankruptcy Court approval, if necessary, of any further actions that may be required to consummate the Transactions. Sellers shall promptly provide Purchaser with the proposed final drafts of all documents, motions, Orders, or pleadings that Sellers propose to file with the Bankruptcy Court which relate to the approval of this Agreement, the Purchased Assets, the Assumed Executory Contracts or the Assumed Leases or the consummation of the Transactions, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

8.15.   Environmental Matters.   From the date hereof through the Closing, each Seller shall (i) keep any property either owned or operated by it or any of its subsidiaries free of any Environmental Liens; (ii) comply, and cause each of its subsidiaries to comply, with all material Environmental Laws and provide to Purchaser any documentation of such compliance that Purchaser may reasonably request; (iii) provide Purchaser with written notice within three (3) days of any Release of a Hazardous Material in excess of any reportable quantity from or onto property at any time owned or operated by it or any of its subsidiaries and take any Remedial Actions required to abate said Release; and (iv) provide Purchaser with written notice within three (3) days of the receipt of any of the following:  (A) notice that an Environmental Lien has been filed against any property of any Seller or any of its subsidiaries; (B) commencement of any Environmental Action or notice that an Environmental Action will be filed against any Seller or any of its subsidiaries; and (C) notice of a violation, citation or other administrative order which could have a Material Adverse Effect.

8.16.   Post-Closing Conduct of Business.   Purchaser covenants and agrees that, following the Closing, no affiliate of Purchaser shall conduct a business that competes with the business conducted by Purchaser with the Purchased Assets.

## ARTICLE IX
## EMPLOYEE MATTERS

9.1.  <u>No Obligation to Employ.</u>  Purchaser shall be under no obligation to hire or employ any employee of any Seller.  Purchaser shall not assume, and shall not be deemed to have assumed, any Liability for any claims or Liabilities arising out of or in connection with Sellers' employment of any employee at any time.  Nothing in this Agreement shall be construed to create an employer-employee relationship between Purchaser and any employee of any Seller.  Without limiting the generality of the foregoing, Purchaser shall not be liable for, and Sellers hereby expressly retain, any claims related to any Employee Benefit Plan or arising under the WARN Act.

9.2.  <u>Prospective Employees.</u>  Sellers shall reasonably facilitate the opportunity for Purchaser to interview, offer employment to, and hire, in Purchaser's sole and absolute discretion, any of Sellers' employees (each, a "<u>Prospective Employee</u>") as are identified by Purchaser, if any, on terms and conditions satisfactory to Purchaser and such Prospective Employees.  Purchaser shall be provided access to, and be allowed to communicate with, such Prospective Employees.  Sellers shall not, and shall not attempt to, engage or transfer the services of any Prospective Employee to any other business operated by Sellers or their successors; provided, however, that in the event Purchaser does not offer employment to a Prospective Employee within ten (10) days after Closing or Purchaser hires and then later terminates any Prospective Employee, Sellers may re-hire such individual.

9.3.  <u>Sellers' Retention of Employees.</u>  After Closing, Sellers may, but are not required to, retain one or more Prospective Employees or other current employee of Sellers on such terms as may be agreed to between such Prospective Employee and Sellers, including without limitation, on a contract basis; provided however, that (a) the terms of any such relationship between such Prospective Employee and Sellers shall be on a non-exclusive basis and upon a basis which will permit the Prospective Employee to be employed by Purchaser on a "full-time" basis, and (b) the time devoted by such employees to the Sellers shall not exceed 10 hours per week during the first month following the Closing Date and 5 hours per week thereafter for a maximum period of 2 years following the Closing Date.

## ARTICLE X
## CONDITIONS TO CLOSING

10.1.  <u>Conditions Precedent to Obligations of Purchaser.</u>  The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)  The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Purchaser shall have

31

received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)      Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(c)      Purchaser shall have received all Permits necessary or useful for the conduct of the Business (which Purchaser shall use commercially reasonable efforts to timely obtain);

(d)      From the date hereof through the Closing Date, (i) there shall have been no Material Adverse Effect and (ii) Purchaser shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(e)      The aggregate Cure Costs as determined by the Bankruptcy Court shall not be more than 125% of $100,000;

(f)      The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Purchaser);

(g)      All consents or similar approvals, if any, required of any Governmental Body to the Closing shall have been received;

(h)      the Bankruptcy Court shall have entered the Executory Contract Assumption Order and the Lease Assumption Order and such Orders shall be Final Orders and Sellers shall have otherwise received all consents and approvals necessary to assume and assign the Assumed Executory Contracts and Assumed Leases;

(i)      Sellers shall have caused the Trust Causes of Action to be vested in a litigation trust (the "Litigation Trust"), the terms of such Litigation Trust to be acceptable to Purchaser in its sole and absolute discretion, and the Bankruptcy Court shall have entered an Order (which Order (i) shall be acceptable to Purchaser in its sole and absolute discretion, (ii) shall be a Final Order, and (iii) may be the Sale Order) authorizing and approving the creation of the Litigation Trust, the terms thereof, and the vesting of the Trust Causes of Action therein; and

(j)      Sellers shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

10.2.   Conditions Precedent to Obligations of Sellers. The obligations of Sellers to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)   The representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)   Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect in his or her corporate (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud); and

(c)   Purchaser shall have delivered to Sellers all of the items set forth in Section 4.3.

10.3.   Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Sellers in whole or in part to the extent permitted by applicable Law):

(a)   there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; and

(b)   the Bankruptcy Court shall have entered the Sale Order, the Lease Assumption Order, and the Executory Contract Assumption Order, and none of these orders shall have been stayed by a court of competent jurisdiction.

10.4.   Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI
## TAXES

11.1.  Purchase Price Allocation.  Sellers and Purchaser shall allocate the Purchase Price among the Purchased Assets in accordance with a statement (the "Allocation Statement") provided by Purchaser to Sellers as soon as practicable after the Closing, which statement shall be prepared in accordance with Section 1060 of the Tax Code and the regulations thereunder. Purchaser and Sellers shall file all Tax Returns (including Form 8594) that are consistent with, and shall take no tax position that is inconsistent with, the Allocation Statement.

11.2.  Tax Reporting.  Purchaser and Sellers shall each be responsible for the preparation and filing of their own Tax Returns.

11.3.  Cooperation and Audits.  Purchaser and Sellers shall cooperate fully with each other regarding Tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to Taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such Taxes.

11.4.  Transfer Taxes.

(a)  The parties shall take such steps as are reasonably necessary to avoid the imposition of any Transfer Taxes on the Transactions.  Without limiting the generality of the foregoing, Sellers shall neither impose nor seek to collect any amounts on account of any Transfer Taxes, nor make any filing indicating that any Transfer Taxes are due or payable on account of the Transaction, provided that upon request by Sellers, Purchaser shall have furnished Sellers with one or more resale certificates, in form and substance reasonably acceptable to Sellers, at or prior to the Closing.  Sellers and Purchaser shall cooperate in the timely making of all filings, returns, report and forms as may be required in connection with this Section 11.4(a) to avoid the imposition of Transfer Taxes.

(b)  The parties agree that if any Transfer Taxes are imposed notwithstanding the compliance by the parties with the provisions of Section 11.4(a), such Transfer Taxes shall be the responsibility of, and be timely paid by, Purchaser, to the extent such Transfer Taxes are less than $2,000 in the aggregate, and shall be paid fifty percent (50%) by Sellers and fifty percent (50%) by Purchaser, to the extent such Transfer Taxes exceed $2,000 in the aggregate.

## ARTICLE XII
## MISCELLANEOUS

12.1.  Expenses.  Except as otherwise provided in this Agreement, Sellers and Purchaser shall bear their own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions.

34

12.2.   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.6</u> hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 12.6</u>.

12.3.   <u>Waiver of Right to Trial by Jury</u>. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.4.   <u>Entire Agreement; Amendments and Waivers</u>. This Agreement (including the schedules and exhibits hereto) collectively represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.5.   <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

12.6.   <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Sellers to:

ALSTON & BIRD LLP
Grant T. Stein
Dennis J. Connolly
William S. Sugden
Sage M. Sigler
1201 West Peachtree Street
Atlanta, GA 30309-3424
Facsimile:      (404) 253-8222
E-mail:         grant.stein@alston.com
                dennis.connolly@alston.com
                will.sugden@alston.com
                sage.sigler@alston.com

with copies to:

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Joel A. Waite
Kenneth J. Enos
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801-0391
Facsimile:      (302) 571-1253
E-mail:         jwaite@ycst.com
                kenos@ycst.com

If to the Committee, to:

BRINKMAN PORTILLO & RONK, P.C.
4333 Park Terrace Drive, Ste. 205
Westlake Village, CA 91361
Attn:   Daren R. Brinkman
        Laura J. Portillo
Facsimile:      (818) 597-2998
E-mail:         dbrinkman@brinkmanlaw.com
                lportillo@brinkmanlaw.com

36

with copies to:

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
222 Delaware Avenue, Ste. 1501
Wilmington, DE 19801
Attn:   Steven K. Kortanek
Thomas M. Horan
Facsimile:       (302) 252-4330
E-mail:          skortanek@wcsr.com
                 thoran@wcsr.com

If to Purchaser to:

KAISER AIRCRAFT INDUSTRIES, INC.
9300 Lee Highway
Fairfax, Virginia, 22031
Attn: Nicholas Burakow
Facsimile:
E-mail:

with copies to:

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, CA 90067
Attn:   Thomas E. Patterson
        Ronn S. Davids
Facsimile:       (310) 407-9090
E-Mail:          TPatterson@ktbslaw.com
E-Mail:          RDavids@ktbslaw.com

If to SVBF, to:

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:   Russell C. Silberglied
John H. Knight
L. Katherine Good
Facsimile:       302-651-7701
E-mail:          silberglied@rlf.com
                 knight@rlf.com
                 good@rlf.com

If to the PBGC, to:

PENSION BENEFIT GUARANTY CORPORATION
Office of the Chief Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026
Attn:   James L. Eggeman
          Erika E. Barnes
Facsimile:     (202) 326-4112
E-mail:        barnes.erika@pbgc.gov
               efile@pbgc.gov

12.7.   Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

12.8.   Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Purchaser or any Seller (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided that Purchaser may assign some or all of its rights and obligations hereunder to one or more designees.  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to Sellers or Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9.   Counterparts.  This Agreement may be executed in one or more counterparts, which may be delivered by facsimile or electronic mail, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[Signature Page Follows]*

38

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PURCHASER:**

**KAISER AIRCRAFT INDUSTRIES, INC.**

By: _____

Name: DOUGLAS W. MCMINN

Title: PRESIDENT

**SELLERS:**

**ALABAMA AIRCRAFT, INC.**

By: _____

Name: _____

Title: _____

**ALABAMA AIRCRAFT — BIRMINGHAM, INC.**

By: _____

Name: _____

Title: _____

**PEMCO ENGINEERING SERVICES, INC.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PURCHASER:**

**KAISER AIRCRAFT INDUSTRIES, INC.**

By: _____
    Name: _____
    Title: _____

**SELLERS:**

**ALABAMA AIRCRAFT, INC.**

By: _____
    Name: RONALD A. ARAMINI
    Title: PRESIDENT & CEO

**ALABAMA AIRCRAFT -- BIRMINGHAM, INC.**

By: _____
    Name: RONALD A. ARAMINI
    Title: CEO

**PEMCO ENGINEERING SERVICES, INC.**

By: _____
    Name: RONALD A. ARAMINI
    Title: CEO

SCHEDULE 1-A
ASSUMED EXECUTORY CONTRACTS

Information Technology Contracts
- Dedicated Access Service Agreement by and between Alabama Aircraft Industries, Inc. (formerly Pemco Aeroplex) and the Birmingham Division of Bright House Networks, LLC dated 12/2/09.

- Concepts in Production, LLC (Subscription Renewal Service for Solidworks Office, CAMWorks 3 Axis Milling, and Predator DNC/4

- Critical Components, Inc. APC/MGE CPCS MFR's Service Agreement with Alabama Aircraft for period of 7/31/11 to 7/30/12

- RFGen Software Maintenance Agreement between The DataMAX Software Group, Inc. and Alabama Aircraft Industries, Inc.

- Deltacom Agreement for Service dated 1/8/2009 – Quote ID#Q6UJ9A0KUEOS

- EMC Corporation Continuous Coverage Product Maintenance Agreement

- Hewlett Packard/TSA Everything HP

- McAfee

- Software License Agreement between MHC Companies, Inc. and Pemco Aeroplex effective 11/30/00

- Nextel

- Services Contract number 4433690 and the Oracle License and Services Agreement dated February 27, 2006 between Oracle USA, Inc. and Pemco Aviation Group, Inc., together with any amendments thereto

- Quest Software Maintenance Services

- Sage Software End User License Agreement for period 9/12/10 thru 9/11/11.

- Scriptlogic – Purchase Agreement dated 6/16/2011 for 1 yr renewal support for Desktop Authority. Expires 7/26/2012

- Symantec

- Software License Agreement between Vertex, Inc. and Pemco Aeroplex, Inc. dated 5/13/99

- VM Ware, Inc. Support and Subscription Services "SnS"

FAST2 Contracts/Teaming Agreements
- ARINC-Prime Contract #FA8530-08-D-0001
- DRS Services-Prime Contract #FA8530-08-D-0005
- General Dynamics Information Technology-Prime Contract # FA8530-08-D-0006
- L3 Communications-Prime Contract #FA8530-08-D-0007
- British Aerospace-Prime Contract #FA8530-08-D-0010
- Northrup Grumman-Prime Contract #FA8530-08-D-0011
- Raytheon-Prime Contract #FA8530-08-D-0012
- SAIC-Prime Contract #FA8530-08-D-0013
- Scientific Research Corporation-Prime Contract #FA8530-08-D-0014

Lockheed Martin Agreements
- The Teaming Agreement relating to the DESPIII program opportunity, Government RFP FA8224-09-R-DESPIII, dated on or about April 6, 2010 Subcontract Agreement # AAI08D0008 between Lockheed Martin Integrated Systems, Inc. and Alabama Aircraft Industries, Inc.
- Subcontract Agreement # AAI08D0008 between Lockheed Martin Integrated Systems, Inc. and Alabama Aircraft Industries, Inc.
- P.O. # 7200005350 dated 6/29/2009, as amended by change orders, with all attachments, in support of contract FA8530-08-D-0008, Delivery Order 0004, entitled "Romanian Avionics Upgrade Modification", including, without limitation, any and all warranty obligations imposed by Section 4.4.4 of the Performance-Based Work Statement which is Attachment 8, or otherwise.
- P.O. # 7200008142 dated 12/10/2010, as amended by change orders, in support of contract FA8530-08-D-0008, Delivery Order 0016, entitled "Removal and Replacement of Rainbow and Corner Fittings IRAQ AIR FORCE C-130E"

SbAST Contract and Related Teaming Agreements
- WR-ALC Contract #FA8530-11-D-0002
- ILSC Teaming Agreement
- R4 Teaming Agreement

U.S. Army UH-60 Helicopter Contract #W911W6-11-P-0030

Backshop Contracts
- Defense Support Services (UH-60 Parts) Contract #FA8108-09-D-0003
- DLA Aviation (Wire Rope Assemblies) Contract #SPM4A7-10-D-5541
- U.S. Navy Contract (ATCC Consoles) Contract #N00421-08-D-0024

L-3 Communications Teaming Agreement for the P-3 SMIP Contract

L-3 Communications Basic Ordering Agreement 23600/5L-084 for P-3 PDM

OO-ALC Contract for C-130 Depaint Services Contract #FA8224-11-D-0006

[ASSET PURCHASE AGREEMENT – SCHEDULE 1-A]

City of Birmingham Mutual Aid Agreement for Fire and Rescue Services

Pemco World Air Services Sale Agreement with WAS Aviation Services, Inc. including the Transition Services Agreement

USAF KC-135 Flap Drive Gearbox Contract #FA8118-10-D-0043

SCHEDULE 1-B
ASSUMED LEASES

1)    Lease Agreement by and between The Birmingham Airport Authority and
      Alabama Aircraft Industries, Inc. – Birmingham dated January 1, 1957 as
      amended.

2)    (Capital Lease with Pinnacle Leasing on CNC Lathe Machines)
      Security Agreement effective 7/6/2009 between Pinnacle Leasing Inc. and
      Alabama Aircraft Industries, Inc. – Birmingham

3)    (Capital Lease with Modspace on DCMA Facility)
      Lease Agreement by and between Modular Space Corporation and Alabama
      Aircraft Industries dated 2/9/2009.

4)    Equipment Lease Agreement with Neopost, Inc. (Postage Meter) dated 7/24/2009
      (Initial Lease term of 63 months)

SCHEDULE 2.1(b)(xi)
EXCLUDED INSURANCE POLICIES

Executive and Organization Liability Insurance
National Union Fire Insurance Company of Pittsburgh, PA
Policy No. 01-825-08-59

Broadest Form Directors and Officers Liability Insurance
Houston Casualty Company
Policy No. 14-MG-10-A10174

Excess Indemnity Policy
U.S. Specialty Insurance Company
Policy No. 14-MGU-10-A21367

Employee Practice Liability Insurance
National Union Fire Insurance Company of Pittsburgh, PA
Policy No. 01-825-39-97

Workers Compensation and Employers Liability Policy
Liberty Mutual
Policy No. WC2-Z21-968721-010

Employee Benefit Plan Fiduciary Liability Insurance
National Union Fire Insurance Company of Pittsburgh, PA
Policy No. 01-825-46-65

SCHEDULE 2.1(b)(xix)
ADDITIONAL PURCHASED ASSETS

None.

SCHEDULE 2.2(l)
ADDITIONAL EXCLUDED ASSETS

None.

## SCHEDULE 2.5
## ALL EXECUTORY CONTRACTS AND LEASES

Information Technology Contracts

- Dedicated Access Service Agreement by and between Alabama Aircraft Industries, Inc. (formerly Pemco Aeroplex) and the Birmingham Division of Bright House Networks, LLC dated 12/2/09.

- Concepts in Production, LLC (Subscription Renewal Service for Solidworks Office, CAMWorks 3 Axis Milling, and Predator DNC/4

- Critical Components, Inc. APC/MGE CPCS MFR's Service Agreement with Alabama Aircraft for period of 7/31/11 to 7/30/12

- RFGen Software Maintenance Agreement between The DataMAX Software Group, Inc. and Alabama Aircraft Industries, Inc.

- Deltacom Agreement for Service dated 1/8/2009 – Quote ID#Q6UJ9A0KUEOS

- EMC Corporation Continuous Coverage Product Maintenance Agreement

- Hewlett Packard/TSA Everything HP

- McAfee

- Software License Agreement between MHC Companies, Inc. and Pemco Aeroplex effective 11/30/00

- Nextel

- Services Contract number 4433690 and the Oracle License and Services Agreement dated February 27, 2006 between Oracle USA, Inc. and Pemco Aviation Group, Inc., together with any amendments thereto

- Quest Software Maintenance Services

- Sage Software End User License Agreement for period 9/12/10 thru 9/11/11.

- Scriptlogic – Purchase Agreement dated 6/16/2011 for 1 yr renewal support for Desktop Authority. Expires 7/26/2012

- Symantec

- Software License Agreement between Vertex, Inc. and Pemco Aeroplex, Inc. dated 5/13/99

- VM Ware, Inc. Support and Subscription Services "SnS"

FAST2 Contracts/Teaming Agreements
- ARINC-Prime Contract #FA8530-08-D-0001
- DRS Services-Prime Contract #FA8530-08-D-0005
- General Dynamics Information Technology-Prime Contract # FA8530-08-D-0006
- L3 Communications-Prime Contract #FA8530-08-D-0007
- British Aerospace-Prime Contract #FA8530-08-D-0010
- Northrup Grumman-Prime Contract #FA8530-08-D-0011
- Raytheon-Prime Contract #FA8530-08-D-0012
- SAIC-Prime Contract #FA8530-08-D-0013
- Scientific Research Corporation-Prime Contract #FA8530-08-D-0014

Lockheed Martin Agreements
- The Teaming Agreement relating to the DESPIII program opportunity, Government RFP FA8224-09-R-DESPIII, dated on or about April 6, 2010 Subcontract Agreement # AAI08D0008 between Lockheed Martin Integrated Systems, Inc. and Alabama Aircraft Industries, Inc.
- Subcontract Agreement # AAI08D0008 between Lockheed Martin Integrated Systems, Inc. and Alabama Aircraft Industries, Inc.
- P.O. # 7200005350 dated 6/29/2009, as amended by change orders, with all attachments, in support of contract FA8530-08-D-0008, Delivery Order 0004, entitled "Romanian Avionics Upgrade Modification", including, without limitation, any and all warranty obligations imposed by Section 4.4.4 of the Performance-Based Work Statement which is Attachment 8, or otherwise.
- P.O. # 7200008142 dated 12/10/2010, as amended by change orders, in support of contract FA8530-08-D-0008, Delivery Order 0016, entitled "Removal and Replacement of Rainbow and Corner Fittings IRAQ AIR FORCE C-130E"

SbAST Contract and Related Teaming Agreements
- WR-ALC Contract #FA8530-11-D-0002
- ILSC Teaming Agreement
- R4 Teaming Agreement

U.S. Army UH-60 Helicopter Contract #W911W6-11-P-0030

Backshop Contracts
- Defense Support Services (UH-60 Parts) Contract #FA8108-09-D-0003
- DLA Aviation (Wire Rope Assemblies) Contract #SPM4A7-10-D-5541
- U.S. Navy Contract (ATCC Consoles) Contract #N00421-08-D-0024

L-3 Communications Teaming Agreement for the P-3 SMIP Contract

L-3 Communications Basic Ordering Agreement 23600/5L-084 for P-3 PDM

OO-ALC Contract for C-130 Depaint Services Contract #FA8224-11-D-0006

[ASSET PURCHASE AGREEMENT – SCHEDULE 2.5]

City of Birmingham Mutual Aid Agreement for Fire and Rescue Services

Pemco World Air Services Sale Agreement with WAS Aviation Services, Inc. including the Transition Services Agreement

USAF KC-135 Flap Drive Gearbox Contract #FA8118-10-D-0043

Lease Agreement by and between The Birmingham Airport Authority and Alabama Aircraft Industries, Inc. – Birmingham dated January 1, 1957 as amended.

(Capital Lease with Pinnacle Leasing on CNC Lathe Machines)
    Security Agreement effective 7/6/2009 between Pinnacle Leasing Inc. and Alabama Aircraft Industries, Inc. – Birmingham

(Capital Lease with Modspace on DCMA Facility)
    Lease Agreement by and between Modular Space Corporation and Alabama Aircraft Industries dated 2/9/2009.

Equipment Lease Agreement with Neopost, Inc. (Postage Meter) dated 7/24/2009 (Initial Lease term of 63 months)

CSX Lease

Matthew Gold Agreements

KC-135 Service Contract with Boeing

Ricoh Copier Contract

Xerox Equipment Contract

USAF KC-135 Sliding Windows Contract #FA8119-10-D-0009

Workers Compensation Agreements (Strategic Comp., Attenta, Avizent)

Insurance Brokerage Agreements (McGriff and SS Nesbitt)

Computershare Agreement

RSC Equipment Rental

R&M Equipment Rental

Great American Insurance Workers Compensation Insurance Contract

[ASSET PURCHASE AGREEMENT – SCHEDULE 2.5]

Utility Contracts

Retiree Medical Benefits

U.S. Army Target Drone-Center Fuselage Contract #W31P4Q-11-P-0034

Iron Mountain Storage Contract

Consulting Agreement With Rick Goddard

Collective Bargaining Agreement

Retention Agreements/Employee Letter Agreements

Employee Benefits for Salary Personnel
-   Medical (BCBS Contract)
-   Vacation
-   Sick Leave

AT&T

Broadvision

SCHEDULE 3.2(a)
WIRE INSTRUCTIONS

Wells Fargo
101 Leaf Lake Pkwy
Birmingham, AL 35203
ABA # 121000248

<u>For Credit To</u>:
Alabama Aircraft Industries, Inc.
1943 50th Street North
Birmingham, AL 35212

Acct # 2000722134980

SCHEDULE 5.8
PERMITS

1)   EPA ID # ALD004002077 issued by Environmental Protection Agency

2)   Alabama Department of Environmental Management
     Storm Water (NPDES)
     Permit # ALG12-0054
     Expires 9/30/2012

3)   Jefferson County Health Department
     Title V Air Compliance
     Permit # 4-07-0150-03
     Expires 4/28/2015

4)   Alabama Department of Environmental Management
     State Indirect Discharge (SID) permit
     Permit Number IU393700047
     Expires 6/30/2016

5)   City of Birmingham Business License
     Taxpayer Account No. 100014, Location No. 001
     Expires 12/31/11

6)   State of Alabama, Jefferson County
     Manufacturing Business License
     License No. 11012316
     Expires 9/30/11

7)   Jefferson County, Alabama License
     County Business License
     License No. 110148198
     Expires 9/30/11

8)   Alabama Department of Revenue, Sales, Use & Business Tax Division
     Permit to Purchase Tangible Personal Property without the Payment to the
     Vendor of the Sales or Use Tax
     Permit No. SDP-8000 RA067

9)   ISO 9001:2008 and AS9100:2004 Rev. B Certificate of Registration issued by
     Perry Johnson Registrars, Inc.

10)  United States of America, Department of Transportation
     Federal Aviation Administration
Air Agency Certificate No. IG4R257M

[ASSET PURCHASE AGREEMENT – SCHEDULE 5.8]

SCHEDULE 5.11
TAXES

None.

SCHEDULE 5.12(a)
COLLECTIVE BARGAINING AGREEMENTS

1.  Agreement between Alabama Aircraft Industries, Inc.-Birmingham and the
    International Union, United Automobile, Aerospace and Agricultural Implement
    Workers of America, and its Local Union 1155 dated March 21, 2005, as
    amended on March 21, 2010.

SCHEDULE 5.12(b)
LABOR MATTERS

None.

SCHEDULE 5.12(f)
EMPLOYEES

1)      Consultant Agreement made as of October 5, 2009, between Alabama Aircraft
        Industries, Inc - Birmingham, and Richard N. Goddard

2)      Alabama Aircraft Industries, Inc. Executive Retention Plan
        a.  Ronald A. Aramini
        b.  Randall C. Shealy
        c.  Doris K. Sewell
        d.  Garry H. White
        e.  Gilbert J. McSheehy

3)      Alabama Aircraft Industries, Inc. – Birmingham Employee Retention Plan
        a.  Jeffrey C. Smith
        b.  Bob Richard
        c.  Bruce Heard
        d.  Tommy Massingill
        e.  Alan Vines
        f.  Jay Mather
        g.  Tim Walker
        h.  Bobby Gardner

## SCHEDULE 5.13
## ENVIRONMENTAL MATTERS

| PRP Sites | | | | |
|---|---|---|---|---|
| Site Name | Name and address of the Government Unit | Date of Notice | Environmental Law | |
| Philip Services Corporation Site 2324 Vernsdale Road Rock Hill SC | Pat Vincent South Carolina Dept of Health and Environmental Control (SCDHEC-BL&WM) 2600 Bull Street Columbia SC 29201 | 3/1/2005 | CERCLA | |
| Performance Advantage County Road 29 Weogufla, AL | Anita Davis US EPA Atlanta Federal Center 61 Forsyth Street Atlanta, GA 30303 | 6/17/2010 | CERCLA | |

| Release notification | | | | |
|---|---|---|---|---|
| Site Name | Name and address of the Government Unit | Date of Notice | Environmental Law | Issue |
| Alabama Aircraft Industries, Inc 1943 50th Street North Birmingham AL 35212 | Janna McIndoe Birmingham Field Office Alabama Department of Environmental Management | 7/15/2010 | Clean Water Act | Fuel Farm |
| Hayes International Corporation (AAII) 1943 50th Street North Birmingham AL 35212 | Bernard E Cox Department of Public Health Montgomery AL 36130 | 9/27/1982 | RCRA | Drum Yard |
| PEMCO (AAII) 1943 50th Street North Birmingham AL 35212 | Monique Miles ADEM 1400 Coliseum Blvd Montgomery AL 36110 | 7/27/06 | NPDES | WW w/o Permit |

| List of Judicial or Administrative proceedings including settlements or orders | | | | | |
|---|---|---|---|---|---|
| Name and address of the Government Unit | Docket Number | | Status or Deposition | Environmental Law | Settlement | Issue |
| United States of America vs Hayes International Corporation and Louis Beasley | 786 F.2D 1499 | 1982 | Closed | RCRA | | Improper disposal |
| Curt Fehn US EPA Atlanta Federal Center 61 Forsyth Street Atlanta, GA 30303 | TSCA-04-2008-2537(b) | 2008 | Closed | TSCA | $ 3,289.00 | PCB |
| Ms. Kim Pierce RCRA Enforcement and Compliance Branch Waste Management Division U.S. EPA, Region 4 61 Forsyth St., SW Atlanta, GA 30303-8909 | 98-01-r | 1998 | closed | RCRA | $ 95,000.00 | CACO |
| Mr. Jeff Kitchens, Chief Hazardous Waste Branch Land Division Alabama Department of Environmental Management 1400 Coliseum Blvd. Montgomery, AL 36110-2059 | 98-01-r | 1998 | closed | RCRA | one fine see EPA | CACO |

[ASSET PURCHASE AGREEMENT – SCHEDULE 5.13]

## APA Exhibit A

BILL OF SALE

## BILL OF SALE

This Bill of Sale ("Bill of Sale") is executed this __ day of September, 2011 by KAISER AIRCRAFT INDUSTRIES, INC. ("Purchaser"), and ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM and PEMCO AIRCRAFT ENGINEERING SERVICES, INC., (collectively, the "Sellers"), pursuant to that certain Asset Purchase Agreement (the "APA"), dated as of August 19, 2010, between Sellers and Purchaser, and is subject to all of the terms and conditions thereof. Capitalized terms used but not otherwise defined herein shall have the same meanings as ascribed to such term in the Purchase Agreement.

In exchange for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers hereby assigns, transfers, and conveys unto Purchaser, its successors and assigns forever, the Purchased Assets (as that term is defined in the APA).

Seller covenants and agrees that it shall at any time from time to time do, execute, acknowledge and deliver any and all other acts, deeds, assignments, transfers, conveyances, powers of attorney or other instruments that Purchaser reasonably deems necessary or proper to carry out the assignment and conveyance intended to be made hereunder.

The terms and provisions of this Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, including, without limitation, any chapter 11 trustee appointed in the Bankruptcy Case or any trustee appointed in any case or cases under chapter 7 of the Bankruptcy Code to which the Bankruptcy Case may be converted.

Notwithstanding any other provision of this Bill of Sale to the contrary, nothing contained in this Bill of Sale shall in any way supersede, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in the APA nor shall this Bill of Sale reduce, expand or enlarge any remedies under the APA including, without limitation, any representations or warranties specified therein. In the event of any conflict between the terms of this Bill of Sale and the APA, the terms of the APA shall govern. This Bill of Sale is intended only to effect the transfer of the Purchased Assets sold and purchased pursuant to the terms of the Purchase Agreement, and shall be governed entirely in accordance with the terms and conditions of the APA.

This Bill of Sale shall be construed in accordance with, and governed in all respects by, the internal laws of the State of Delaware (without giving effect to principles of conflicts of laws).

This Bill of Sale may be executed in two or more facsimile or electronic counterparts, all of which shall be considered one and the same agreement and shall become effective when two or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

[ASSET PURCHASE AGREEMENT – EXHIBIT A]

[SIGNATURE PAGE TO FOLLOW]

**IN WITNESS WHEREOF,** Seller has duly caused this Bill of Sale to be executed as of the date first above written.

**SELLERS:**

**ALABAMA AIRCRAFT INDUSTRIES, INC.**

By: _____
        Name:
        Title:

**ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM**

By: _____
        Name:
        Title:

**PEMCO AIRCRAFT ENGINEERING SERVICES, INC.**

By: _____
        Name:
        Title:

Receipt of which is acknowledged by Purchaser:

**PURCHASER:**

**KAISER AIRCRAFT INDUSTRIES, INC.**

By: _____
        Name:
        Title:

## APA Exhibit B

**EXECUTORY CONTRACT
ASSUMPTION AND ASSIGNMENT AGREEMENT**

## EXECUTORY CONTRACT ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS EXECUTORY CONTRACT ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of this ___ day of August, 2011 (the "Closing Date"), by and among (i) ALABAMA AIRCRAFT INDUSTRIES, INC., ALABAMA AIRCRAFT INDUSTRIES, INC.-BIRMINGHAM and PEMCO AIRCRAFT ENGINEERING SERVICES, INC., (the "Debtors" or "Assignors"), and (ii) KAISER AIRCRAFT INDUSTRIES, INC. ("Kaiser" or "Assignee").

### R E C I T A L S :

WHEREAS, one or more of the Assignors is a party under the executory contracts (the "Executory Contracts") attached hereto as **Exhibit A**,

WHEREAS, each of the Executory Contracts is an executory contract within the meaning of section 365 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, on February 15, 2011, each of the Assignors filed a voluntary petition for relief under title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are jointly administered under Case No. 11-10452 (the "Bankruptcy Case");

WHEREAS, pursuant to an Asset Purchase Agreement dated as of August 19, 2011 (the "APA"), between the Debtors and Kaiser, the parties have agreed that Kaiser shall acquire substantially all of the operating assets, and assume certain liabilities, of the Debtors;

WHEREAS, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court on August 19, 2011 seeking entry of an order authorizing the Debtors to enter into and perform the APA;

WHEREAS, the Bankruptcy Court entered an order granting the Sale Motion on August ___, 2011 (the "Sale Order");

WHEREAS, the Sale Order determined the amount of the cure payments (the "Cure Costs") due to each of the non-debtor parties to an Executory Contract as set forth on Exhibit A;

WHEREAS, a condition to Kaiser's obligation to close under the APA is the execution and delivery of this Agreement;

WHEREAS, subject to the terms and conditions set forth herein, Assignee wishes to acquire from Assignors all of Assignors' right, title, interest, duties and obligations to and under the Executory Contracts, in accordance with the terms of this Agreement, and Assignors wish to assign and delegate to Assignee all of Assignors' right, title, interest, duties and obligations to and under the Executory Contracts; and

[ASSET PURCHASE AGREEMENT – EXHIBIT B]

**WHEREAS,** the Debtors and Kaiser are deriving material incidental benefits by the consummation of the transactions contemplated by the APA.

## NOW, THEREFORE, THE PARTIES HERETO AGREE AS FOLLOWS:

1.     **Defined Terms.**  Capitalized terms used and not defined herein shall have the meanings ascribed to them in the APA.

2.     **Assumption and Assignment of the Executory Contracts.**  Assignors hereby sell, convey, transfer, assign and deliver to Assignee and its successors and assigns, all of Assignors' right, title and interest in and to the Executory Contracts and Assignee hereby assumes and agrees to discharge or perform when due in accordance with their respective terms and subject to the respective conditions thereof, the Executory Contracts.

3.     **Terms of Assignment.**  Notwithstanding any other provision of this Agreement to the contrary, nothing contained in this Agreement shall in any way supersede, merge with, modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions set forth in the APA nor shall this Agreement reduce, expand or enlarge any remedies under the APA.  This Agreement is intended only to evidence the sale, transfer, assignment, conveyance and delivery of the Executory Contracts as of the Closing Date pursuant to the APA and shall be governed entirely in accordance with the terms and conditions of the APA.  The terms of the APA, including but not limited to the Assignors' representations, warranties, covenants, agreements and indemnities relating to the Executory Contracts, are incorporated herein by this reference.  In the event of a conflict or an inconsistency between this Agreement and the APA, the terms of the APA shall prevail.

4.     **Miscellaneous.**

4.1     Assignment.  This Agreement may not be assigned without the prior written consent of each of the parties hereto.

4.2     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

4.3     Submission to Jurisdiction; Consent to Service of Process.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the courts of the State of Delaware, and any appellate court thereof, for the resolution of any such

[ASSET PURCHASE AGREEMENT – EXHIBIT B]

claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.6.

       4.4    Entire Agreement. This Agreement sets forth the entire agreement and understanding of the parties with respect to the transactions contemplated hereby and supersedes any prior instruments, arrangements and understandings relating to the subject matter hereof.

       4.5    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

       4.6    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the notice addresses set forth in the APA.

       4.7    Additional Documents. Each party agrees to perform any further acts and execute and deliver such further documents which may be reasonably necessary to carry out the terms of this Agreement.

       4.8    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same instrument. A signature sent by facsimile transmission or electronic mail on a counterpart signature page shall be considered as binding and as admissible in evidence as a manual signature.

[SIGNATURE PAGE TO FOLLOW]

[ASSET PURCHASE AGREEMENT – EXHIBIT B]

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first above written.

**ASSIGNORS:**

ALABAMA AIRCRAFT, INC.

By:_____
     Name:_____
     Title:_____

ALABAMA AIRCRAFT – BIRMINGHAM, INC.

By:_____
     Name:_____
     Title:_____

     PEMCO ENGINEERING SERVICES, INC.

By:_____
     Name:_____
     Title:_____


**ASSIGNEE:**

KAISER AIRCRAFT INDUSTRIES, INC.

By:_____
     Name:_____
     Title:_____

# APA Exhibit C

**LEASE ASSUMPTION AND ASSIGNMENT AGREEMENT**